462 F.2d 1205
 UNITED STATES of America
v.
John V. KENNY et al.
Appeal of William A. STERNKOPF, Jr., in No. 71-1886.
Appeal of Fred J. KROPKE, in No. 71-1887.
Appeal of Joseph B. STAPLETON, in No. 71-1888.
Appeal of Philip W. KUNZ, in No. 71-1889.
Appeal of Bernard MURPHY, in No. 71-1890.
 Nos. 71-1886 to 71-1890.
 United States Court of Appeals,
 Third Circuit.
 Argued Feb. 18, 1972.
Decided May 22, 1972.
As Amended June 9, 1972.
 
 Mac Asbill, Jr., Sutherland, Asbill & Brennan, Washington, D. C., David M. Satz, Jr., Newark, N. J., Rufus E. Brown, Michael L. Denger, Washington, D. C., for appellant, William A. Sternkopf, Jr.; Saiber, Schlesinger & Satz, Newark, N. J., of counsel.
 John J. Carlin, Jr., James E. Davidson, Farrell, Curtis, Carlin & Davidson, Morristown, N. J., for Fred J. Kropke.
 Lawrence P. Brady, Jr., Jersey City, N. J., for Joseph B. Stapleton.
 Arnold M. Stein, Stein & Einhorn, Denville, N. J., for Philip W. Kunz.
 Robert A. Baime, Irvington, N. J., for Bernard Murphy.
 Herbert J. Stern, U. S. Atty., John J. Barry, Marc L. Dembling, David R. Hinden, Richard M. Langway, Asst. U. S. Attys., on the brief, Newark, N. J., for appellee.
 Before VAN DUSEN, ADAMS and GIBBONS, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 On November 16, 1970 a federal grand jury in Newark returned a thirty-four count indictment against John V. Kenny, Thomas Whelan, Thomas Flaherty, Walter Wolfe, John J. Kenny, William Sternkopf, Jr., Fred Kropke, Frank G. Manning, Joseph Stapleton, Philip Kunz, James R. Corrado and Bernard Murphy. Prior to trial the defendants Frank G. Manning, and John J. Kenny (no relation to John V. Kenny and called hereinafter J. J. Kenny) were severed and were granted immunity pursuant to 18 U.S.C. Sec. 2514. Corrado pleaded guilty to one count on May 21, 1971. During the trial, on June 11, 1971 John V. Kenny (hereinafter J. V. Kenny), because of physical inability to continue, was severed. At the close of the Government's case five counts of the indictment were dismissed on the motion of the Government. On July 5, 1971, the jury returned verdicts of guilty against seven of the eight remaining defendants on all twenty-nine remaining counts and against defendant Kunz on seventeen of those counts. Sentences were imposed on August 10, 1971[1] and all defendants except Wolfe appealed. Thereafter the defendants Whelan and Flaherty withdrew their appeals. Thus of the twelve named in the indictment the appeals of five, Sternkopf, Kropke, Stapleton, Kunz and Murphy, are before us.
 
 
 2
 Count I of the indictment charges that each of the defendants, during the period from November 1, 1963 to the date of the indictment, conspired in violation of 18 U.S.C. Sec. 1951[2] to obstruct, delay, and affect interstate commerce by impeding construction undertaken on behalf of the City of Jersey City and the County of Hudson by contractors engaged in interstate commerce, in order to obtain the property of such contractors with their consent, which was induced both by the wrongful use of fear and under color of official right. Count II of the indictment charges that each of the defendants, during the period from November 1, 1963 to November 16, 1970, in violation of 18 U.S.C. Sec. 371[3] conspired to commit violations of 18 U.S.C. Sec. 1952[4] by using the facilities of interstate commerce to carry on an unlawful activity, that activity being the crimes of bribery and extortion in violation of the laws of the State of New Jersey. Thus the indictment charges violations of two separate federal conspiracy statutes; the specific prohibition in Sec. 1952 against conspiracies to obstruct, delay or affect commerce (Count I) and the general prohibition in Sec. 371 against conspiracies to commit an offense against the United States (Count II). The offense alleged against the United States in Count II is the substantive violation of Sec. 1952-interstate travel to commit extortion or bribery in violation of state law. Section 1952, unlike Sec. 1951, does not contain a specific prohibition against conspiracy. Section 1951 prohibits both substantive offenses and conspiracies. Counts III through XXXIV of the indictment each charges a separate substantive violation of Sec. 1951 by the extortion of a specific sum of money from a specific contractor.
 
 
 3
 *****
 
 
 4
 * * *
 
 
 5
 Each of the defendants was, or had been, a highly placed public official or political leader in Jersey City or Hudson County or both. It was the Federal Government's theory that each acting in concert with one or more of the others used his position to fasten upon both the city and county administrations a system whereby no one could do business with either without kicking back a percentage, usually 10%, of the contract price. According to the Federal Government this was achieved in three principal ways. First, the competitive bidding process was perverted by a "pre-qualification" arrangement which enabled the defendants to exclude from bidding contractors unwilling to kick back. Second, payments for work already done would be withheld until the kickback was made. Finally, on contracts not subject to competitive bidding the contract would not be awarded to anyone unwilling to kick back. At the head of this corrupt system, according to the Federal Government, was the defendant J. V. Kenny, who, although he held no public office or official party position in the years in question, was de facto the absolute boss of the political party in power. Under his leadership, it was contended, the defendants fastened a thoroughly meshed arrangement on both city and county administrations by which they subverted those governmental units into corrupt vehicles for their own private enrichment.
 
 
 6
 These contentions were amply proved by the testimony of numerous witnesses, but particularly by the testimony of the two defendants, Manning and J. J. Kenny, who as immunized witnesses detailed their own participation in the corrupt system, its methods of operation, its pervasiveness, and its long term success. The testimony of these acknowledged participants was corroborated in detail not only by the testimony of numerous victims, but by proof of the existence of substantial hoards of ill gotten gains accumulated by one or more of the participants. The proof in the record of the existence of a system for diverting the apparatus of city and county government to private, unlawful ends is overwhelming.
 
 
 7
 Each of the appellants, however, contends that as to him the proof was not all that overwhelming, that the Government's case placed him at the periphery at best, and that he was prejudiced before or during the trial in various ways. Most of the appellants urge common legal and factual issues, and these will be so discussed. Where the situation of any appellant is unique specific reference will be made to him.
 
 
 8
 I. Contentions with Respect to Discovery of the Government's Case
 
 
 9
 All defendants engaged in extensive pre-trial motion practice looking to discovery of the Government's case. That case was substantially documentary. The court ordered the Government, on defendants' motion, to permit them to inspect all tangible evidence related in any way to the case, to furnish in advance copies of any records which the Government might use at the trial and to furnish a copy of the grand jury testimony of each defendant who had testified before the grand jury. As it turned out, there was a room full of documents. This room was kept open to the defendants six days a week prior to the trial and even on Sunday during the trial. Several of the defendants contend that the court's approach was so overly liberal that they never made any meaningful use of the vast volume of materials made available. This contention is without substance. The nature of the conspiracy was such that it generated a great deal of tangible evidence, including $50,090.00 in currency, all of which was available for inspection. The only evidence which was not, pursuant to the court's order, available for inspection prior to trial, was evidence of certain transactions which did not come to the Government's attention until the trial was under way. The court gave the defendants an adequate opportunity during trial to prepare to meet any such later discovered evidence.
 
 
 10
 Several defendants contend that the court erred in denying their motion for a bill of particulars. The court in the exercise of its sound discretion declined to require the Government to answer a set of detailed interrogatories in the guise of a bill of particulars. This decision to permit liberal inspection of all tangible evidence placed a greater burden of preparation on the defendants than would have been the case had their suggested course, requiring answers to a detailed bill of particulars, been followed. This, however, was a matter within the discretion of the court. The court leaned heavily toward liberal discovery throughout the case, and the defendants cannot be heard to complain about the balance of the burden of preparation which it struck between the prosecution and the defense. Ample opportunnity for preparation was available, and from the evidence in the record was in fact availed of.
 
 
 11
 Defendant Stapleton contends that the court erred in denying his motion, pursuant to Fed.R.Crim.P. 16(a), for a copy of the statements of government witnesses setting forth conversations with him. We rejected the same contention in United States v. Fioravante, 412 F.2d 407, 410 (3d Cir. 1969), cert. denied, Panaccione v. United States, 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969). Rule 16(a) does not require the discovery of witness statements. Those statements are governed by the provisions of the Jencks Act, 18 U.S.C. Sec. 3500. That statute was complied with during the trial.
 
 
 12
 Finally, defendants Kropke and Stapleton contend that it was error for the court to refuse discovery, prior to trial, of the contents of affidavits used to support the issuance of search warrants on October 8, 1971. The affidavit was on the Government's motion impounded in the interest of justice. The warrants directed the search of their offices. The defendants sought its inspection in connection with a proposed motion to suppress the fruits of the search. In response the United States Attorney urged that the motion to suppress be deferred until trial. He agreed to produce the affidavit at trial and represented that the Government would not object to the timeliness of the suppression motion at that time. Nevertheless Kropke and Stapleton made motions pursuant to Fed. Fed.R.Crim.P. 41(e), for suppression. in response to these motions the United States Attorney stipulated that the Government would make no use of the materials seized in the search in its affirmative case at the trial. In effect the Government, rather than disclose the contents of the affidavits consented to the suppression motion. In these circumstances the court refused to permit pretrial inspection of the affidavits.
 
 
 13
 Stapleton and Kropke contend, nevertheless, that they were prejudiced by the use of the seized evidence before the grand jury. But a defendant may not challenge an indictment on the ground that illegally obtained evidence was presented to the grand jury. United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966); Lawn v. United States, 355 U.S. 339, 78 S. Ct. 311, 2 L.Ed.2d 321 (1968); Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956); United States ex rel. Almeida v. Rundle, 383 F.2d 421, 424 (3d Cir. 1967), cert. denied, 393 U.S. 863, 89 S.Ct. 144, 21 L.Ed.2d 131 (1968); United States v. Grosso, 358 F.2d 154, 163 (3d Cir. 1966); rev'd on other grounds, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968). Stapleton and Kropke urge that the rule of these cases was changed by our decision in In Re Grand Jury Proceedings, Harrisburg, Pennsylvania, 450 F.2d 199 (3d Cir. 1971), cert. granted, United States v. Egan, 404 U.S. 990, 92 S.Ct. 531, 30 L.Ed.2d 541 (Dec. 14, 1971). That case turns on the provisions of a specific statute, 18 U.S.C. Secs. 2514, 2515, and involves the standing of a witness, in that capacity, to refuse to testify before a grand jury. That issue is not presented in this record. Nothing in the Harrisburg Grand Jury case reflects upon the continuing validity of the rule of Blue, Lawn and Costello that a defendant cannot challenge an indictment on the ground that it was based on illegally obtained evidence.
 
 
 14
 In connection with the search warrant contentions of Stapleton and Kropke the Federal Government makes the additional point that its consent to the suppression motion was not an acknowledgement that the affidavits were insufficient. The consent was made solely for the purpose of avoiding a revelation of the identity of a potential witness. It urges that an examination of the affidavits will disclose compliance with the formula set forth in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), explained in Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) and possibly contracted in United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). Because we hold that Blue, Lawn and Costello control we do not reach that contention. At a later point we will discuss the use which was made at the trial of the materials seized pursuant to the warrants.[5]
 
 II. Contentions Addressed to the Indictment
 
 15
 The appellants make a series of contentions addressed to the form of the indictment, the claimed variance of the proofs from the charge and the joinder of issues and parties. These may be categorized under the headings of vagueness, duplicity, variance and prejudicial joinder.
 
 Vagueness
 
 16
 Sternkopf and Kropke urge that Count II of the indictment is vague as to contravene both the fifth and the sixth amendments. Kropke also contends that Count I is unconstitutionally vague. All the appellants have joined in these contentions.
 
 
 17
 The attack upon Count I requires no prolonged discussion. It is identical in all material respects with that approved in United States v. Addonizio, 451 F.2d 49 (3d Cir. 1971), cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (Feb. 22, 1972). Count II charges that the defendants:
 
 
 18
 ". . . did knowingly . . . conspire . . . with each other, and with other persons . . . to commit certain offenses . . . in violation of Section 1952 of Title 18 . . . in that the defendants and said co-conspirators would travel and wilfully cause others to travel in interstate commerce and that they would use and wilfully cause others to use the facilities in interstate commerce . . . to promote, manage, establish and carry on and facilitate the promoting, managing, establishing and carrying on of an unlawful activity, said unlawful activity being the crimes of bribery and extortion in violation of the laws of the State of New Jersey, and it was further part of said conspiracy that the defendants would thereafter perform and cause others to perform acts of promoting . . . of said unlawful activity and acts facilitating the promoting . . . of said unlawful activity."
 
 Section 1952 in relevant part reads:
 
 19
 "(a) Whoever travels in . . . or uses any facility in interstate . . commerce . . . with intent to-
 
 
 20
 ******
 
 
 21
 * * *
 
 
 22
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any acts specified in [subparagraph] . . (3) shall be fined . . . or imprisoned . . .
 
 
 23
 (b) As used in this section 'unlawful activity' means . . . (2) extortion, bribery or arson in violation of the laws of the State in which committed . . ."
 
 
 24
 A substantive violation of Sec. 1952(a) (3) thus requires proof of interstate travel or use of interstate facilities with intent to promote extortion or bribery followed by attempts to perform such extortion or bribery. The indictment alleges all elements of this substantive offense in the language of Sec. 1952. It charges a conspiracy to violate that section between November 1, 1963 and the date of the indictment, and it alleges further that part of the conspiracy was the performance of other acts for the purpose of concealment.
 
 
 25
 Appellants contend that this indictment was so vague that it permitted the Federal Government to prove any extortion or bribery participated in by the alleged conspirators in violation of New Jersey law in the specified time period. This, they contend left the prosecutor free to prove offenses which had never been considered by the grand jury, thereby violating the fifth amendment guarantee that an accused charged with a serious crime be tried only on an indictment of a grand jury. They contend, moreover, that Count II did not set forth a "plain, concise and definite written statement of the essential facts constituting the offense charged," Fed. R.Crim.P. 7(c), and thus violated their sixth amendment guarantee that they be informed of the "nature and cause of the accusation."
 
 
 26
 We hold that Count II complied with the standards set forth in Hagner v. United States, 285 U.S. 427, 431, 52 S.Ct. 417, 76 L.Ed. 861 (1932) and Wong Tai v. United States, 273 U.S. 77, 81, 47 S.Ct. 300, 71 L.Ed. 545 (1927). See United States v. Dreer, 457 F.2d 31 (3d Cir., filed Mar. 9, 1972). It charges the statutory crime in the language of the statute. It specifies the time period during which the conspirators are claimed to have acted. It both apprises the appellants of the charges against them and protects them against any future double jeopardy. See United States v. Dreer, supra; United States v. Addonizio, supra; Vandersee v. United States, 321 F.2d 57 (3d Cir. 1963); United States v. Palmiotti, 254 F.2d 491, 495 (2d Cir. 1958); United States v. Achtner, 144 F.2d 49, 51 (2d Cir. 1944). In affording such protection the indictment in this case differs crucially from that found defective in United States v. Raysor, 294 F.2d 563 (3d Cir. 1961). The contention that it permitted the proof of offenses not permitted to the grand jury is without substance. The Federal Government was required to offer to the grand jury some proof of the ongoing conspiracy alleged in Count II. It was not required to offer proof of every violation of New Jersey law which occurred as a result of that ongoing conspiracy. Evidence of some such violations did not come to the attention of the prosecuting authorities until after the indictment was returned. This evidence was, however, probative of the overall continuing conspiracy which the grand jury charged. Thus this case is not at all like Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), in which the grand jury charged a specific substantive interference with interstate commerce and the Government proved a different substantive interference. Indeed the form of the indictment was compelled by the nature of the conspiracy. It was a conspiracy to exact a toll from everyone who could be made amenable to such an exaction by virtue of the defendants' control of the administrative apparatus of local government. It is entirely likely that neither the grand jury nor the federal prosecuting authorities have not to this day discovered every instance of bribery or extortion by the conspirators in violation of New Jersey law. But the conspiracy to violate Sec. 1952 during the specified period was charged and was proved. The appellants cannot again be put in jeopardy for the same conspiracy even if new instances of violations of the New Jersey bribery and extortion laws in the same time period should now be discovered.
 
 Duplicity
 
 27
 Appellants urge that because the Federal Government's position at all times was that there was a single overall conspiracy they were prejudiced by the fact that they were charged with two separate conspiracy counts. The maximum sentence under Sec. 1951 is twenty years, and none of the defendants received a sentence in excess of twenty years. A single general sentence was imposed. Since each sentence was less than the maximum permitted under Sec. 1951 the judgment should be upheld if conviction on the Sec. 1951 count is sustainable. Barenblatt v. United States, 360 U.S. 109, 115, 79 S.Ct. 1081, 3 L.Ed. 2d 1115 (1959); Roviaro v. United States, 353 U.S. 53, 55-56, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); Whitfield v. Ohio, 297 U.S. 431, 438, 56 S.Ct. 532, 80 L.Ed. 778 (1936); Claassen v. United States, 142 U.S. 140, 147, 12 S.Ct. 169, 35 L.Ed. 966 (1891); Peoples v. United States, 412 F.2d 5 (8th Cir. 1969) and cases cited therein.
 
 
 28
 We need not rest affirmance on that ground alone, however. The single overall conspiracy violated two separate federal statutes prohibiting conspiracies. Count I charges a violation of the conspiracy prohibition in 18 U.S.C. Sec. 1951-conspiracy to interfere with interstate commerce. Count II charges a violation of the general federal conspiracy statute in 18 U.S.C. Sec. 371-conspiracy to violate a federal statute, in this case 18 U.S.C. Sec. 1952, by conspiring to use the facilities of interstate commerce to violate state law. Count I required proof of interference with interstate commerce by extortion. Count II required proof of use of the facilities of interstate commerce. So long as each required proof of a fact not essential to the other, even though the charges arose from a single act or series of acts, or as here a single conspiracy, the defendants could be convicted of both. Pereira v. United States, 347 U.S. 1, 9, 74 S.Ct. 358, 98 L.Ed. 435 (1954); United States v. Beacon Brass Co., 344 U.S. 43, 45, 73 S.Ct. 77, 97 L.Ed. 61 (1952); American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); United States v. Noveck, 273 U.S. 202, 206, 47 S.Ct. 341, 71 L.Ed. 610 (1927); Gavieres v. United States, 220 U.S. 338, 31 S.Ct. 421, 55 L.Ed. 489 (1911); United States v. Samuel Dunkel & Co., 184 F.2d 894 (2d Cir. 1950), cert. denied, 340 U.S. 930, 71 S.Ct. 491, 95 L.Ed. 671 (1951); cf. United States v. Caci, 401 F.2d 664 (2d Cir. 1968), cert. denied, 394 U.S. 917, 89 S.Ct. 1180, 22 L.Ed.2d 450 (1969). Separate federal interests were invaded by the separate violation of two conspiracy statutes by a single conspiracy. See American Tobacco Co. v. United States, supra, 328 U.S. at 787, 66 S.Ct. 1125.
 
 
 29
 Moreover each of these statutes permits a different range of sentence.[6] It was proper to charge both violations as separate counts of the indictment.
 
 Variance
 
 30
 The appellants contend that their convictions should be reversed because of a fatal variance between the proofs adduced at trial and the indictment. To put this argument in perspective it must be recalled that in addition to the two conspiracy counts the indictment alleged thirty-two separate substantive counts charging separate extortive transactions with interstate contractors or suppliers in violation of 18 U.S.C. Sec. 1951. Evidence was offered tending to prove twenty seven of these counts, and most of that evidence tended to show concert of action between one or more of the defendants and hence to prove Count I. Evidence was offered with respect to many of these same transactions tending to prove that one or more of the defendants acting in concert caused the facilities of interstate commerce to be used in furtherance of the extortion, and hence to prove Count II. Thus this is not a case where there was no evidence of the existence of a conspiracy. Compare United States v. DeCavalcante, 440 F.2d 1264 (3d Cir. 1971), cert. den. 404 U.S. 1039, 92 S.Ct. 715, 30 L.Ed. 731. The appellants claim, however, that although there was ample proof of concert of action, and ample proof of substantive violations of 18 U.S.C. Sec. 1951, and ample proof of use of the facilities of interstate commerce, and ample proof of bribery and extortion in violation of New Jersey law, the Government in fact proved several separate unrelated conspiracies under each conspiracy count. They argue that the proof established a Jersey City conspiracy to extort from contractors, a separate Jersey City conspiracy to extort from gamblers, a Hudson County conspiracy to extort from contractors, a separate conspiracy to extort from J. Rich Steers Company in connection with a Port of New York Authority contract, and a separate conspiracy to extort from Di Feo Motors. They urge that it was improper to lump together in one indictment several conspiracies, Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and that by permitting proof of separate conspiracies the court permitted the Government to amend the indictment without resubmission to the grand jury. Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962).
 
 
 31
 Kotteakos prohibits charging multiple unrelated conspiracies, but it does not prohibit charging one master conspiracy and establishing at trial that under the master conspiracy more than one subsidiary scheme was involved. Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947). Explaining Kotteakos in Blumenthal Justice Rutledge wrote:
 
 
 32
 "Except for Brown, the common figure, no conspirator was interested in whether any loan except his own went through. And none aided in any way, by agreement or otherwise, in procuring another's loan. The conspiracies therefore were distinct and disconnected, not parts of a larger general scheme, both in the phase of agreement with Brown and also in the absence of any aid given to others as well as in specific object and result. There was no drawing of all together in a single over-all comprehensive plan." 332 U.S. at 558, 68 S.Ct. at 257.
 
 
 33
 Here there is ample evidence of a large general scheme, and of aid given by some conspirators to others in aid of that scheme. Each of the appellants was connected by evidence to the large general scheme. At the head of the scheme was J. V. Kenny who, the evidence suggests, ruled the political life of both city and county. Each of the remaining defendants held an official position in city or county government as a result of membership in J. V. Kenny's organization. He effectively determined who would hold public office in either government and he organized a system to insure that all contractors working on a public project would kickback a percentage of the contract price to a designated bagman. Generally speaking members of the city government would collect kickbacks from city contractors and members of the county government would collect from county contractors. But the roles played by various conspirators varied from time to time. Thus city collector Murphy was at one point replaced by Manning, who in turn was replaced by Flaherty. County collector Schlosberg was at his death replaced by J. J. Kenny, who was in turn replaced, after a falling out with J. V. Kenny, by Manning, who was eventually replaced by Wolfe. Manning, as County Engineer on occasion collected from firms which were performing city work. J. J. Kenny, a County Freeholder, on occasion collected from firms which were performing city work. The pattern of conduct reflected in the evidence is that of a determined group who repeatedly cooperated closely to achieve the common purpose of self-enrichment by extracting kickbacks. The key to success of all their depravities was their common control over the administration of city and county government under the leadership of J. V. Kenny. Without detailing all of the transactions, evidence about Ashland Oil Company, the subject of one of the substantive counts, discloses the typical common ingredients. J. V. Kenny ordered the extortion; Sternkopf made the original demand. Sternkopf recruited Manning to make the collection, and Manning collected the money and turned it over to Wolfe. When the conspirators learned that Schuster, an Ashland employee, was appearing before the federal grand jury, Wolfe gave cash to Kropke to return to Schuster. Kropke attempted to do so but could not reach Schuster. He then returned the cash to Wolfe who returned it to Stapleton.
 
 
 34
 Manning and J. J. Kenny, the immunized co-conspirators, described the "system" or "official family" and the role of each defendant in it. It is clear from the evidence that none of the so called separate conspiracies could have operated except for the existence of the overall conspiracy charged by the grand jury. The court clearly charged that each defendant had to be connected with this overall conspiracy. This case is like Blumenthal v. United States, supra, rather than like Kotteakos v. United States, supra, upon which appellants rely.
 
 Prejudicial Joinder
 
 35
 The appellants urge that the joinder Counts I and II of the indictment was improper under Fed.R.Crim.P. 8(a) and that the joinder of defendants was improper under Fed.R.Crim.P. 8(b). They contend that the district court erred in denying their Rule 14 motions for severance of offenses and for separate trials. These severance claims are predicated chiefly upon the allegedly prejudicial effect of evidence admitted against some defendants which in the view of one or more of the appellants was inadmissible against him. Kunz and Kropke further contend that since they played only a minor part in the conspiracy their severance should have been ordered. We find no abuse of discretion. United States v. Weber, 437 F.2d 327, 331-332, 340 (3d Cir. 1970), cert. denied, 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971); United States v. Barrow, 363 F.2d 62 (3d Cir. 1966), cert. denied, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967).
 
 
 36
 The evidence on the two conspiracy counts was essentially the same. The difference between them was that for Count I the government had to establish effect on interstate commerce while in the other it had to establish use of the facilities of interstate commerce. No possible prejudice arose from such evidence. It is true that Count II permitted greater latitude in proving substantive offenses against New Jersey law, since, if use of the facilities of interstate commerce was shown the Government could, and did, prove extortion from persons engaged in activities essentially intrastate. But the extortions in question were of the same character and grew out of the same overall conspiracy. Each involved misuse of the instrumentalities of government upon which the conspirators had fastened themselves. It was, therefore, no abuse of discretion to deny the motions to sever Counts I and II.
 
 
 37
 We turn, then, to the contention that some of the appellants should have been granted separate trials because of the prejudicial effect of evidence admitted against others which would be inadmissible against them. For two reasons we reject this contention. First, the mere possibility that in a joint trial some evidence may be admitted against one defendant which is inadmissible against another is not in itself a sufficient reason for multiple trials growing out of a closely related series of transactions. The prospect that certain evidence will be admissible against one defendant but not against another is a feature of all joint trials. Fed.R.Crim.P. 8 recognizes that this is a possibility, and Rule 14 commits to the sound discretion of the trial court the balancing of the inconvenience to the Government and the judicial process of numerous separate trials against the inconvenience to the defendants of seeking appropriate limiting instructions. See, e. g., United States v. Barber, 442 F.2d 517, 529 (3d Cir. 1971), cert. denied, 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971). There is no abuse of this discretion in the instant case. Second, the granting of separate trials would not have significantly benefited the defendants who now complain. They would not have been able to compel self incriminating testimony of those co-defendants who in this trial declined to testify. Counselman v. Hitchcock, 142 U.S. 547, 562, 12 S.Ct. 195, 35 L.Ed. 1110 (1892). See generally United States v. Housing Foundation of America, 176 F.2d 665 (3d Cir. 1949). There was some evidence linking each defendant to the conspiracy. See United States v. Cohen, 197 F.2d 26 (3d Cir. 1952). Thus the evidence of acts of all the co-conspirators in furtherance thereof would be admissible against them. See, e. g., United States v. Weber, supra; Baker v. United States, 131 U.S.App.D.C. 7, 401 F.2d 958, 974 (1968), cert. denied, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970); Drew v. United States, 118 U.S.App.D.C. 11, 331 F.2d 85, 90 (1964).
 
 
 38
 The real thrust of the appellants' objections to their joint trial is that the rules of evidence pertaining to conspiracy trials operated harshly, particularly because the out-of-court declarations of each co-conspirator became admissible against each other co-conspirator. We are, of course, mindful of the dangers of unfair guilt by association involved in the law of criminal conspiracy. In the instant case, however, there was evidence linking each of the appellants to the conspiracy, although in varying levels of participation.[7] In these circumstances, the evidence rules applicable to conspiracy trials did not operate unfairly. Indeed, this case illustrates the pervasive danger to the community of conspiratorial associations and thus hardly presents a sympathetic vehicle for the reconsideration of the co-conspirator admissions rule, even if we, as opposed to a higher authority, were free to change that rule.
 
 
 39
 III. Contentions Addressed to Admissibility of Evidence in
 
 
 40
 the Government's Case
 
 
 41
 All the appellants complain about various items of evidence admitted during the Government's case. Much of the evidence consisted of shocking revelations by the two immunized co-conspirator defendants, J. J. Kenny and Manning.
 
 A. Evidence of Concealed Wealth
 
 42
 Among the more sensational items of evidence were those establishing the existence of large concealed wealth in the possession or control of one or more of the alleged conspirators. The court admitted in evidence $700,000 in bearer bonds belonging to J. V. Kenny. It admitted evidence of a secret numbered bank account in Miami, Florida, controlled by Whelan and Flaherty, containing $1.2 million. It admitted in evidence $50,090.00 in currency which was given by J. V. Kenny to J. J. Kenny in February 1971, after the indictment, for the purpose of "investigating" and "discrediting" Manning, who by then was suspected of being a potential witness. It admitted testimony that Sternkopf assisted J. J. Kenny to invest substantial funds which the Government contends were proceeds of the crimes charged.
 
 
 43
 Appellants urge, on the authority of Williams v. United States, 168 U.S. 382, 18 S.Ct. 92, 42 L.Ed. 509 (1897) that all the foregoing evidence was improperly admitted because no connection was shown between the possession by the defendants of the sums specified and the extortions for which they were indicted. We have held that sudden unexplained acquisition of wealth at or about the time of the offense charged establishes a sufficient nexus to satisfy the rule of Williams, supra. See United States v. Chaney, 446 F.2d 571 (3d Cir. 1971); United States v. Jackson, 403 F.2d 647, 649 (3d Cir. 1968), cert. denied, Barefield v. United States, 394 U.S. 949, 189 S.Ct. 1287, 22 L.Ed.2d 483 (1969); United States v. Howell, 240 F.2d 149, 158 (3d Cir. 1956). We have also held that evidence of a desire to conceal a large sum of money shortly after a crime sufficiently establishes the connection required by Williams. United States v. McKenzie, 414 F.2d 808 (3d Cir. 1969), cert. denied, Anthony v. United States, 396 U.S. 1019, 90 S.Ct. 586, 24 L.Ed.2d 510 (1970). See also United States v. Jackskion, 102 F.2d 683 (2d Cir.), cert. denied 307 U.S. 635, 59 S.Ct. 1032, 83 L.Ed. 1517 (1939); Commonwealth v. Mulrey, 170 Mass. 103, 49 N.E. 91 (1898). Measured by the rules which this circuit has followed there was in each of the four instances complained of sufficient evidence connecting the money to the conspiracy.
 
 
 44
 (1) The J. V. Kenny Bonds
 
 
 45
 J. V. Kenny arranged during the pendency of the charged conspiracies surreptitious transfers of currency for the acquisition of bonds, through the Trust Company of New Jersey, utilizing the services of Kropke and Sternkopf. Brill, an officer of the Trust Company of New Jersey, testified that Sternkopf called him on the telephone to arrange for the purchase of $200,000 worth of New Jersey Turnpike Bonds. Sternkopf told Brill that a representative of J. V. Kenny would arrange for payment. On October 4, 1966 Kropke brought to the bank $200,870.84 in currency. J. V. Kenny later personally picked up the bonds from Brill after they were delivered to the bank by Lehman Brothers, the underwriter. An official of Lehman Brothers, Ragsdale, testified that after the purchase he had a conversation with Sternkopf in which Sternkopf expressed extreme displeasure over the fact that Lehman Brothers put J. V. Kenny's name on the bill. Sternkopf directed Lehman Brothers "never to put John V. Kenny's name on any such bill" in the future. In May, 1967, J. V. Kenny decided to purchase $200,000 worth of City of New York bonds. Kropke brought Brill $200,000 in currency. After receipt of the bonds from New York Brill personally delivered the bonds to J. V. Kenny at Corrado's office in Pollak Hospital. In April, 1968, Sternkopf telephoned Brill regarding the purchase of $100,000.00 of County of Loran, Ohio, bonds. Brill went to Sternkopf's office, and Sternkopf gave him $102,365.97 in currency, Brill delivered the bonds to Sternkopf. In July 1968 Sternkopf again called Brill and arranged for the purchase of $200,000 worth of New Jersey Turnpike bonds. Brill arranged for the delivery of the bonds from New York and delivered them personally to Sternkopf, receiving $200,000 from him in currency.
 
 
 46
 Brill testified that all the bonds were "bearer bonds", that all were delivered from New York (as charged in Count II), that in each instance the Trust Company of New Jersey as agent for J. V. Kenny paid for the bonds by a bank treasurer's check, thus concealing the fact that J. V. Kenny had available for such purchases during the period when the conspiracy was operating over $700,000 in currency. There was evidence that all kickbacks were made in currency. These transactions were amply connected to the conspiracy. United States v. McKenzie, supra; United States v. Jackskion, supra. They were evidential of the knowledge and participation of Kropke and Sternkopf in that conspiracy. United States v. Addonizio, 449 F.2d 100, 102 (3d Cir. 1971); United States v. Barrow, 363 F.2d 62 (3d Cir. 1966), cert. denied, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967).
 
 
 47
 (2) The Whelan and Flaherty Accounts
 
 
 48
 The immunized defendant, Manning, testified:
 
 
 49
 "Q. Did you ever have any conversation with defendant Flaherty in reference to any of the proceeds of the contractors' envelopes?
 
 
 50
 A. Yes, sir, I did.
 
 
 51
 ******
 
 
 52
 * * *
 
 
 53
 Q. In substance what did the defendant Flaherty say to you and what did you say to him?
 
 
 54
 A. He and Mayor Whelan were very disturbed about the opposition on the Hill, referring to the County organization, that they think we are stupid. They are the stupid ones. They stashed their cash in local banks. He said that we put ours in the bank owned by a friend of mine outside the State. (Tr. 3985)."
 
 
 55
 Later in the trial Dennis Clum, senior Vice President in charge of the Trust Department of the Miami Beach First National Bank testified that James Rogers of that bank, formerly an officer of the First National Bank of Jersey City, introduced him to Flaherty at his office in Miami on November 14, 1968. Flaherty asked if the bank would open a custodial account which would be identified by a number so that his name would not be associated with the account. Clum advised that the bank could open such an account. Flaherty then opened a brown attache case which contained $281,000 in municipal bearer bonds and $242,897 in currency, for a total of $523,897. On many of the bearer bonds the interest coupons had not been clipped since 1966. The accumulated uncollected interest was about $13,000. On September 12, 1969 Flaherty returned to Clum's office, this time in the company of Whelan. Flaherty introduced Whelan and said he wanted to open a similar numbered account in which his name would not be disclosed. Whelan had in his possession municipal bearer bonds of a face amount of $502,000. A numbered custodial account was opened for him. Flaherty instructed the bank to transfer bonds of an equivalent amount of $45,000 from his account to Whelan's. Thereafter on another occasion Whelan and Flaherty came to the bank with their wives and executed agreements whereby each of them and their respective wives would have the right to add to or withdraw from the other's account. On February 2, 1970 Whelan deposited $35,000 in currency in his numbered account and Flaherty deposited $40,000 in currency in his numbered account. On May 13, 1970 Whelan and Flaherty each deposited $30,000 in currency in their respective numbered accounts.
 
 
 56
 In late May or June, 1970, after the federal grand jury investigation of Hudson County and Jersey City had begun, Flaherty called Clum and said he wanted to close both accounts. He told Clum he would send Atkinson, a Jersey City police sergeant, to Miami to pick up authorizations for his and Whelan's signatures. Atkinson went to Florida, picked up the authorization forms, returned to Jersey City and obtained the signatures of Whelan and Flaherty. He returned to Florida on June 12, 1970 with a large suitcase and the executed authorizations. Clum delivered to Atkinson from Flaherty's account $571,000 of face value municipal bearer bonds, a check on principal cash in the amount of $30,025 and a check representing accumulated income of $13,270.36, or a total of $614,295.36. From Whelan's account he delivered municipal bearer bonds in face amount of $577,000, a check drawn on principal cash in the amount of $35,025, and a check representing accumulated income of $6,112.94 or a total of $618,137.94. The four checks totaling $84,433.30 had not been negotiated when Clum testified on June 22, 1971.
 
 
 57
 Manning's testimony connected Flaherty's and Whelan's out of state bank accounts with the conspiracy. But aside from that testimony the existence of large and unexplained amounts of cash and bearer bonds simultaneously with the offenses and the efforts at concealment provide an ample nexus with the conspiracy. United States v. Chaney, supra; United States v. McKenzie, supra; United States v. Jackson, supra; United States v. Howell, supra. Indeed the efforts at concealment of the cash hoards were, as alleged in Count II of the indictment, for the purpose of hiding and concealing the purposes of and acts in furtherance of the conspiracy.
 
 
 58
 (3) The Cash Given by J. V. Kenny to J. J. Kenny
 
 
 59
 The immunized defendant J. J. Kenny testified that on February 3, 1971 after the indictment, and at a time when he had broken with the organization headed by J. V. Kenny, and before he began cooperating with the Government, he met with J. V. Kenny at Newark Airport and asked J. V. Kenny for $50,000. He told J. V. Kenny that he needed this sum to hire investigators and accountants.
 
 
 60
 "Q. Did you tell him why you wanted to hire investigators and accountants?
 
 
 61
 A. Yes, I told him I needed the money and I wanted to spread it to a fellow by the name of Frank Manning." (Tr. 1096-97)
 
 
 62
 Three days later J. J. Kenny received a message from someone named Pandolphi, telling him to go to a garage. He went to the garage and Pandolphi gave him $50,090 in currency. Thereafter he began cooperating with the Government and he turned the money over to the United States Attorney. Each bill was marked, and the $50,090 was offered and received in evidence. Frank Manning, of course, is the other immunized co-defendant. J. J. Kenny testified that he discussed with J. V. Kenny the use to which the money was to be put.
 
 
 63
 "The Witness: The purpose was to hire investigators, accountants, to discredit Mr. Manning.
 
 
 64
 Q. Was there any discussion as to why you wanted to discredit Frank Manning?
 
 
 65
 ******
 
 
 66
 * * *
 
 
 67
 The Witness: The discussion was to discredit Mr. Manning. He was one of the defendants at the time.
 
 
 68
 Q. Did you have any discussion with Mr. John V. Kenny as to why Manning should be discredited?
 
 
 69
 ******
 
 
 70
 * * *
 
 
 71
 The Witness: The discussion was that he was the party that we had to discredit." (Tr. 1116-1118)
 
 
 72
 The appellants urge that the admission of the foregoing testimony and evidence was grounds for a mistrial. They contend that it was perfectly proper for J. J. Kenny, in connection with the preparation of his defense to the indictment, to hire "investigators and accountants" to discredit Manning, and that it was perfectly proper for J. V. Kenny to give J. J. Kenny $50,090 for this purpose. The evidential use to which the Government put the funds, they contend, somehow infringed the right of J. J. Kenny and J. V. Kenny to prepare a defense. But neither Kenny is before us advancing this contention, and the prejudice, if any, must have been to the appellants before us for us to consider it.
 
 
 73
 The issue is whether the testimony was properly admissible against anyone, since on the record in the district court it is clear that the objections made on behalf of the appellants were to any admission of the evidence. There was no request for a limiting instruction to the effect that the testimony and the currency could only be considered against some defendants.[8]
 
 
 74
 It is clear that the furtive transfer of $50,090 in currency from one conspirator to another conspirator for the purpose of discrediting a potential government witness certainly was evidence of consciousness of guilt on the part of the two defendants who participated in the transactions, and thus was admissible against the defendant J. V. Kenny. Next, the ready availability of a $50,090 hoard of currency was highly corroborative of the testimony of J. J. Kenny that the conspirators had extorted millions of dollars of currency which they secreted for their own use. Thus the evidence corroborated his testimony about the operation and success of the system which he described. As such it was admissible on the conspiracy counts against all the conspirators. Finally, the ready availability to one of the conspirators of $50,090 in cash and its transfer to another conspirator at a time shortly after the period during which the conspiracy is alleged to have continued,[9] as with other evidence of large unexplained hoards of currency, tended to establish the offenses charges. United States v. Chaney, supra; United States v. McKenzie, supra; United States v. Jackson, supra; United States v. Howell, supra.
 
 
 75
 Moreover the clandestine transfer of $50,090 in currency from one conspirator to another certainly suggests an effort to conceal its existence. Appellants urge that the only possible construction which may be placed on the testimony is that the money was for legitimate pre-trial preparation by J. J. Kenny. Arguably that was the case, but the circumstances suggest Judge Learned Hand's aphorism, "[t]here may be honor among thieves, but there is no maudlin munificence." United States v. Compagna, 146 F.2d 524, 530 (2d Cir. 1944), cert. denied, 324 U.S. 867, 65 S.Ct. 912, 89 L. Ed. 1422 (1945).
 
 
 76
 Testimony about the $50,090, and the currency, were properly admitted.
 
 
 77
 (4) The Investments in C.E.W. Corporation Made By J. J. Kenny with Sternkopf's Help
 
 
 78
 Sternkopf in particular claims that it was error to admit evidence that he assisted J. J. Kenny in making a concealed investment in C.E.W. Corporation. To put that objection in context it should be recalled that there is other evidence connecting Sternkopf to the conspiracy as early as October 1966. See p. 1222 supra. Moreover before the evidence now complained of was admitted J. J. Kenny had testified about specific extortive transactions involving J. Rich Steers Corporation in which Sternkopf was a participant. Early in 1967, while Sternkopf was the Vice Chairman of the New Jersey Turnpike Authority, Galano, of the Steers firm, told J. J. Kenny he had been to see J. V. Kenny about obtaining a ten million dollar contract with that Authority, that he was interested in turnpike work, and that J. J. Kenny was to see if he could get it for Steers. J. J. Kenny met with Sternkopf and they agreed the Turnpike Contract was worth $50,000.00. J. J. Kenny then met with Galano and Rau, the president of Steers, and negotiated for a $50,000 kickback. Steers got the job and beginning in January 1968 paid the money in installments. One half of each installment was paid to Sternkopf and the other half to Stapleton, the treasurer for the system. Though the payments were made in 1968, Sternkopf's participation began in early 1967. The C.E.W. transaction took place in 1967. J. J. Kenny told Sternkopf that he had some "cash" he wanted to invest. Dooley, J. J. Kenny's brother-in-law, had succeeded Sternkopf as Clerk of the Hudson County Board of Chosen Freeholders on Sternkopf's recommendation. J. J. Kenny told Sternkopf he wanted Dooley to act as his agent in the investment. He gave Dooley $65,000 in currency and a $16,000 check which he had obtained from a friend in exchange for $16,000 in currency. A property in South Jersey was purchased in the name of "C.E.W. Corporation" with Clarence Sprinkle, Edward Dooley and William Sternkopf disclosed principals. Dooley, however, was a nominee for J. J. Kenny, because, as Kenny declared, "I couldn't show that kind of cash." (Tr. 1079). Sternkopf made the arrangements, transmitted the cash and the $16,000 check for purposes of closing and received a twenty per cent interest in C.E.W. without making any investment.
 
 
 79
 Sternkopf would have us hold that the cash invested in C.E.W. was not sufficiently connected with the conspiracy, and improperly tied him into admitted extortions by J. J. Kenny. There was, however, ample evidence that in 1967 Sternkopf was a knowing participant in the system and in the efforts of its members to secrete the proceeds of their joint efforts.
 
 
 80
 When he took the stand in his defense Sternkopf insisted that J. J. Kenny was not a principal in C.E.W., and that he was merely aiding Dooley, a legitimate businessman. The J. J. Kenny version differs. It made Sternkopf a knowledgeable participant in efforts to conceal the fruits of the conspiracy. The conflict between the two versions was for resolution by the jury.
 
 
 81
 The evidence of concealed wealth was in each instance properly admitted.
 
 B. The Di Feo Testimony
 
 82
 J. J. Kenny testified, without objection, that Di Feo Buick sold tires and cars to Hudson County and to Jersey City and that the owner, Sam Di Feo made kickbacks to him which, pursuant to the arrangements of the system, he turned over to Stapleton. (Tr. 1007-8) Di Feo, called by the Government, demanded and received immunity. Without objection he testified that he gave cash kickbacks to J. J. Kenny on cars sold to Hudson County, on cars sold to Jersey City to Murphy, and on cars ordered by Kunz for the Jersey City Sewerage Authority to Flaherty. Still without objection he testified:
 
 
 83
 "Q. In 1969 what position, to your knowledge, did Fred Kropke hold in Hudson County?
 
 
 84
 A. He was the Chief of Police for the County.
 
 
 85
 Q. Did there come a time when you had any dealings with him in reference to some police cars for the Hudson County Police Department?
 
 
 86
 A. Well, he ordered ten police cars and I delivered the police cars. After that I had to give him two other cars, one was for himself and one was for Captain Robbins.
 
 
 87
 ******
 
 
 88
 * * *
 
 
 89
 "Q. Did the defendant Kropke give you any instructions as to the bill for the Datsun for himself and the Oldsmobile for Captain Robbins?
 
 
 90
 A. He instructed me to bill these things to the County.
 
 
 91
 Q. Did he tell you how to bill it to the County?
 
 A. As police cars." (Tr. 2103-04)
 
 92
 The Government then offered Exhibit 2165, the invoice to the County for the two cars falsely described as Buick specials. For the first time the defendants objected to the admission of the exhibit on grounds of relevancy. The objection was overruled and the invoice received in evidence. Di Feo then testified without objection:
 
 
 93
 "Q. Did Chief Kropke tell you why he wanted the invoice filled out that way?
 
 
 94
 A. So the County could pay for both cars." (Tr. 2105)
 
 
 95
 The invoice, amounting to $5,327.80, was paid by the county.
 
 
 96
 There was no request for any limiting instruction at the time of the testimony, and no objection to the testimony. On appeal several defendants urge plain error. Fed.R.Crim.P. 52.
 
 
 97
 We see none. Clearly the kickback testimony was proof of the existence of the conspiracy alleged in Count II. These were crimes of extortion or bribery under the laws of the State of New Jersey. The testimony with respect to the false invoices for cars delivered to Kropke and Robbins did not, technically, establish the offense of extortion or bribery under New Jersey law, since Di Feo was paid by the County. The district court recognized as much when at the end of the case it charged:
 
 
 98
 "Ladies and gentlemen, my attention has been directed to the fact that I said the property in question here was money and in the case of Di Feo automobiles. Upon giving further thought to this I will eliminate 'automobiles,' because I do not recall any testimony of an instance where Mr. Di Feo didn't get paid for the automobile. Regardless of where the automobile went afterwards the County paid for it, but the automobile wasn't extorted from him. There is evidence that money was extorted from him." (Tr. 6833).
 
 
 99
 Kropke was a member of the official family who owed his position as Chief of the Hudson County police to J. V. Kenny. He was deeply involved in J. V. Kenny's efforts to conceal the cash loot of the conspiracy. He was in the position to perpetrate the venal fraud described in the Di Feo testimony only because the system of which he was a part had diverted the administration of county government to its private ends. Even if the Di Feo-Kropke transaction is regarded as a separate sub-conspiracy it is adequately connected to the one grand conspiracy in which all the defendants joined under the leadership of J. V. Kenny. Blumenthal v. United States, supra.
 
 
 100
 Moreover, against Kropke, the evidence, even if considered not a part of the overall conspiracy charged, was admissible, within the discretion of the trial court, as proof of motive, opportunity, intent, plan, knowledge and absence of mistake. See Rule 4-04, Proposed Rules of Evidence for the United States District Courts and Magistrates (1971); United States v. Hamilton, 455 F.2d 1268 (3d Cir., filed Feb. 14, 1972); United States v. Weiler, 385 F.2d 63 (3d Cir. 1967); United States v. Klass, 166 F.2d 373 (3d Cir. 1948). The appellants can hardly claim there was an abuse of such discretion when by failing to object they never presented the issue to the district court.
 
 
 101
 Finally, even if the evidence were not properly admissible against Kropke, and we have held otherwise, its admission against him, with no request for a limiting instruction from the remaining defendants, is as to all of them at worst harmless error, Fed.R.Crim.P. 52(a), rather than plain error. Rule 52 (b).
 
 
 102
 IV. Contentions Addressed to the Government's Cross
 
 Examination of Defense Witnesses
 
 103
 The appellants contend that several prejudicial errors took place during the Government's cross examination of defense witnesses.
 
 A. Use of Suppressed Materials
 
 104
 We have referred heretofore, to the fact that the Government, rather than disclosing the contents of affidavits used to obtain search warrants, agreed that it would make no use of the materials seized in its affirmative case. The searches and seizures were made at the offices of Stapleton and Kropke. Both took the stand and testified. Both were confronted on cross examination with the seized materials in order to impeach their direct testimony. Both acknowledge that the seized evidence could, despite the Government's consent to suppression, be used for impeachment purposes. Harris v. New York, 401 U.S. 222, 226, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); Walder v. United States, 347 U.S. 62, 65, 74 S.Ct. 354, 98 L.Ed. 503 (1954). Both now contend that their direct testimony was in no way impeached by the seized evidence and that its use was therefore improper. The record discloses, however, that the testimony of each was substantially misleading and that the use made of the seized evidence was in the case of both properly impeaching. Moreover in Stapleton's cross examination the first reference to the seized materials was volunteered by him. There was no error in the use made of the suppressed materials on cross examination.
 
 B. The Larner Report
 
 105
 A former Governor of New Jersey, Robert B. Meyner, testified as a character witness for Sternkopf. He testified as to Sternkopf's reputation for honesty, integrity and veracity. On cross examination he insisted he had never heard anything bad about Sternkopf and he volunteered that he had him checked out quite thoroughly before appointing him, on the recommendation of J. V. Kenny to the New Jersey Turnpike Authority. Mr. Meyner was then confronted with sections of a report on an investigation into the municipal affairs of Jersey City made in 1954 and commonly known as the Larner Report. Prepared at the order of the Superior Court of New Jersey, it reflected quite adversely upon Sternkopf's performance as the supposedly independent City Auditor. Sternkopf contends this kind of cross examination of a character witness was impermissible. We have held otherwise. United States v. Polack, 442 F.2d 446, 447 (3d Cir. 1971), cert. denied, 403 U.S. 931, 91 S.Ct. 2253, 29 L. Ed.2d 710 (1971). The scope of cross examination was within the sound discretion of the trial court. That discretion was not abused here. The cross examination went to Mr. Meyner's knowledge of Sternkopf's reputation and to Mr. Meyner's standard of good repute.
 
 C. Kropke's Financial Condition
 
 106
 On his direct examination Kropke admitted delivering the attache case full of cash from J. V. Kenny to Brill. See pp. 1219-1220 supra. He admitted that he attempted, after the grand jury investigation was underway, to return to Schuster of Ashland Oil $9,000 of a $10,000 payment which had been obtained from Ashland, acting at the direction of Wolfe. In these transactions, he contended, he was an innocent and unknowledgeable participant. He ended his direct testimony by asserting that he never took a dollar from any of the contractors doing business with Hudson County. He complains on appeal that he was cross examined about his financial worth and his expenditures and that in such cross examination the Government made use of his income tax returns. The returns were used only to refresh his recollection as to his reported income, and no claim was made that they were false. The cross examination was proper. Kropke, holding a trusted appointive law enforcement position in a governmental apparatus which, the evidence disclosed, had been largely diverted from the purpose of public service to that of private gain, had participated in the efforts of some of the co-conspirators to secrete the loot, and had participated in the efforts of others, when the grand jury investigation was in progress, to return some of the extorted funds to Ashland Oil Company. In the face of such evidence it was proper for the court to permit the Government to test the credibility of his protestations of non-participation by seeking to establish the sources of his expenditures during the years in question. The bounds of such cross examination was a matter for the discretion of the trial court. United States v. Greenberg, 419 F.2d 808 (3d Cir. 1971). No abuse of that discretion appears in this record.
 
 
 107
 D. The Court's Refusal to Recall a Government Witness
 
 
 108
 Appellant Murphy contends that it was error for the court to refuse to recall the witness Manning, at the end of the case, nine days after he had completed his testimony, for further cross examination. The alleged purpose of the additional cross examination was to attack Manning's credibility by showing that he had been the indirect recipient of money from Girard Engineering Co., one of the extortion victims. The documents upon which this cross examination was proposed to be based were available to counsel at the time of the original cross examination. In that cross examination the credibility of Manning, the immunized defendant and admitted coconspirator was attacked literally for days. The scope of cross examination on credibility issues was within the discretion of the trial court. The privilege of recross examination a fortiori ". . . lies within the trial court's discretion." United States v. Stoehr, 196 F.2d 276, 280 (3rd Cir.), cert. denied, 344 U.S. 826, 73 S.Ct. 28, 97 L.Ed. 643 (1952).
 
 
 109
 We have considered each other reference to alleged improper cross examination or limitation on cross examination asserted by any defendant, and in the light of the record we find no abuse of discretion with respect to the permitted scope of examination, and no error.
 
 V. Sufficiency of the Evidence
 
 110
 The only appellants who contest the sufficiency of the evidence to support the jury verdict are Kunz and Kropke. We have heretofore in other context discussed the evidence connecting Kropke to the conspiracy. See pp. 1222-1223 supra. That evidence looked at with a view most favorable to the Government was sufficient to present a jury question and to support the verdict on which Kropke was convicted. United States v. Alper, 449 F.2d 1223, 1227 (3rd Cir. 1971); United States v. Carlson, 359 F.2d 592, 597 (3d Cir. 1966). Measured by the same test the evidence connecting Kunz to the conspiracy, though concededly not as strong as that tying in the other defendants was also sufficient. Once the conspiracy is established, as here it was abundantly, only slight evidence is necessary to support a jury verdict that an individual defendant was a member. United States v. Addonizio, 449 F.2d 100, 102 (3d Cir. 1971); United States v. Weber, 437 F.2d 327, 336 (3d Cir. 1970), cert. denied, 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971); United States v. Bey, 437 F.2d 188, 192 (3d Cir. 1971).
 
 
 111
 From July 1, 1965 to July 1, 1969 Kunz was Director of the Department of Public Work of Jersey City. All public works contracts were supervised by his department. Di Feo testified that Kunz ordered the cars for the Jersey City Sewerage Authority on which he paid Flaherty a 10% kickback. The evidence established that on every public works contract let by the Public Works Department a kickback was exacted. The witness Dolan testified that when he became Chief Engineer of that Department Kunz told him that he was not to issue plans and specifications to any contractors without prior clearance from Murphy (Tr. 3246-48). Even though Dolan believed it was his function as Chief Engineer to prequalify contractors, he followed Kunz's instructions. The evidence established that Murphy's prequalification consisted of the exaction of an agreement upon a 10% kickback. Kunz asserts that none of the above evidence establishes his knowledge of or participation in the conspiracy. But it is established in the record that neither Kunz nor any other of the defendants would have been in the public positions which they held without the approval of the system's head, J. V. Kenny. In 1969 Kunz was promoted from Director of the Department of Public Works to Business Administrator. After it was public knowledge that the federal grand jury was investigating Jersey City and Hundson County Kunz, the City Business Administrator, called Dolan to his office and this conversation ensued:
 
 
 112
 "The Witness [Dolan]: Mr. Kunz asked me to come down to his office, which I did do. We discussed several aspects of City business and then he asked me if I had heard the latest about Mario Gallo.
 
 
 113
 I said to him, 'No, what is the latest about Mario Gallo?'
 
 
 114
 He said, 'They found him with a rope around his neck, the same thing could happen to you or to anyone else who talks about what is going on in Jersey City."' (Tr. 3326).
 
 
 115
 We cannot say that the foregoing evidence, looked at most favorably to the Government, does not support the jury verdict against Kunz. See United States v. Alper, supra. 449 F.2d at 1227.
 
 VI. The Suppression Motion At Trial
 
 116
 We have discussed heretofore supra, p. 1212, the contention that a warrant search of the offices of Kropke and Stapleton was not supported by an adequate warrant. At trial the defendant Stapleton moved to suppress the testimony of the witnesses Schuster and Roetman on the ground that it was the fruit of an illegal search. Fed.R.Crim. P. 41(e) (4); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L. Ed.2d 441 (1963). The court heard argument on the motions and declined to hold an evidentiary hearing.
 
 
 117
 Schuster, an employee of Standard Bithulitic, a division of Ashland Oil Co., appeared before the federal grand jury on September 23, 1970 pursuant to a subpoena. He had not previously been in touch with any government agent. His testimony on September 23, 1970 was limited to the structure of Standard Bithulitic and Warren Brothers, and to the identity of various corporate officers.
 
 
 118
 On October 7, 1970 Kropke appeared at Schuster's office, identified someone, falsely, as Wolfe, and attempted to see Schuster for the purpose of returning to Schuster $9,000 out of $10,000 which had been extorted from Schuster's company, and of explaining that the "dinner tickets" which the company purchased were only $100 each, not $1,000 each. He saw Schuster's secretary, Roetman, made known the purpose of the call, but since Schuster wasn't available, did not deliver the money. The money later was seized in Stapleton's office.
 
 
 119
 Prior to October 8, 1970 Schuster gave the United States Attorney the information about Kropke's approach. (Tr. 2526, 2530, 2537). The affidavit in support of the search warrant for Stapleton's office is dated October 8, 1970. (Appellants' Appendix 265). The warrant issued on October 8, 1970 (Appellants' Appendix 267) and was executed the same day. Thereafter on November 11, 1970 Schuster appeared before the grand jury and testified about the conspiracy.
 
 
 120
 The trial court declined to hold an evidentiary hearing because rather than Schuster's and Roetman's testimony being the fruit of the search it was clear in the record that the search was the fruit of the information disclosed, prior thereto, by Schuster. (Tr. 2556-63). The exclusionary rule operates on the fruits of the search, not the seeds.
 
 VII. The Trial Court's Attitude
 
 121
 Appellant Murphy, in particular, and all of the appellants to some degree, assert that the trial judge throughout the trial manifested by his attitude toward defense counsel such extreme hostility and prejudice as to deprive them of a fair trial. From our trial judges we require basic fairness. We desire equanimity. We cannot expect perfect sanctity. No record of over seven thousand pages of a hard fought trial has ever been created in which, removed from the overall context, an appellate court could not isolate occasional indications of impatience or even irritability. This entire record is remarkably free from such indications, and to the extent they do exist they show an even handed effort on the part of the trial court to keep both the government attorneys and the defense attorneys within appropriate bounds. This was a long and hard fought trial before a sequestered jury. The court's efforts to prevent its undue prolongation were proper. See, e.g., United States v. Murray, 445 F.2d 1171, 1176 (3d Cir. 1971) and cases cited. The incidents of which the appellants, especially Murphy, complain, were directed principally to that end. The entire record discloses that the appellants, including Murphy, received a basically fair trial.
 
 
 122
 VIII. The Government's Comments During Summation
 
 
 123
 The appellant's complain that a part of the Government's summation was improper. The part complained of reads:
 
 
 124
 "The first count of this indictment charges that from at least as early as November 1963 the defendants now on trial before you and the other defendants who were severed and other people who are unknown to the Grand Jury entered into a combination, kind of system, under which contractors, engineers, suppliers, anybody who wanted to do business in Jersey City or Hudson county was required to pay tribute, to kickback. You have seen during the course of this trial a number of contractors take the witness stand and testify to exactly that. You have seen two men who were part and parcel with these other men at one time, and they were not talking about them the way they talked about them in the past few days several years ago when they were occupying the adjoining offices. You have seen them take the stand and tell you what was going on, not in Runnymede but in Jersey City and Hudson County, and I suppose the most shocking thing of all about this trial is that in seven full weeks you have not heard a single contractor take the stand, not a single engineer, not a single supplier take the stand and say, 'I did business in Jersey City, in Hudson County and I didn't have to kick-back.'" (Tr. 6637) (emphasis added)
 
 
 125
 The Government witnesses testified that under the system of which they and the defendants were part every contractor doing business with the city had to kick back 10% of the contract price. Numerous contractors and suppliers corroborated this testimony by proof of kick backs they made. The defendants were in a position to know of other contractors who did business with the city, and these contractors were certainly within reach of the court's process. None were called. The comment on their absence was appropriate:
 
 
 126
 ". . . The rule even in criminal cases, is that, if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." Graves v. United States, 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893).
 
 
 127
 See also United States v. Restaino, 369 F.2d 544, 547 (3d Cir. 1966); United States v. Lowe, 234 F.2d 919 (3d Cir. 1956), cert. denied, 352 U.S. 838, 77 S. Ct. 59, 1 L.Ed.2d 56 (1956).
 
 IX. The Court's Charge
 
 128
 One or more of the appellants urge that the court's charge was deficient in one respect or another. Most of these contentions were not called to the attention of the trial court after the charge and before the jury retired to deliberate and hence may not be assigned as error here. Fed.R.Crim.P. 30. Other matters were called to the trial court's attention and were in fact corrected. See, e. g., pp. 1223-1224 supra dealing with Di Feo's testimony.
 
 
 129
 Kropke did take exception to the trial court's definition of extortion under 18 U.S.C. Sec. 1951. The instruction given reads:
 
 
 130
 "The term 'extortion' means the obtaining of property from another with his consent induced either by wrongful use of fear or under color of official right. The term 'fear', as used in the statute, has the commonly accepted meaning. It is a state of anxious concern, alarm, apprehension of anticipated harm to a business or of a threatened loss.
 
 
 131
 ******
 
 
 132
 * * *
 
 
 133
 Extortion under color of official right is the wrongful taking by a public officer of money not due him or his office, whether or not the taking was accomplished by force, threats or use of fear. You will note that extortion as defined by Federal Law is committed when property is obtained by consent of the victim by wrongful use of fear, or when it is obtained under color of official right, and in either instance the offense of extortion is committed." (Tr. 6773-74).
 
 
 134
 Kropke's objection is that the quoted instruction defines Hobbs Act extortion disjunctively; that is, obtaining money or property either by use of fear or under color of official right.
 
 
 135
 In United States v. Addonizio, 451 F. 2d 49 (3d Cir. 1971), which also involved extortion by public officials, the case was submitted to the jury only on a use of fear theory. It has been held that the "under color of official right" language may have no applicability to extortionate acts committed by private individuals. Bianchi v. United States, 219 F.2d 182, 192 (8th Cir. 1955), cert. denied, 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249 (1955). But while private persons may violate the statute only by use of fear and public officials may violate the act by use of fear, persons holding public office may also violate the statute by a wrongful taking under color of official right. The term "extortion" is defined in Sec. 1951(b) (2):
 
 
 136
 "The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."
 
 
 137
 The "under color of official right" language plainly is disjunctive. That part of the definition repeats the common law definition of extortion, a crime which could only be committed by a public official, and which did not require proof of threat, fear, or duress. See, e.g., United States v. Nardello, 393 U.S. 286, 289, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969); United States v. Sutter, 160 F.2d 754, 756 (7th Cir. 1947); State v. Begyn, 34 N.J. 35, 167 A.2d 161 (1961); State v. Weleck, 10 N.J. 355, 371, 91 A.2d 751, 759-760 (1952). The disjunctive charge on Sec. 1951 extortion was correct.
 
 
 138
 Appellant Kunz complains that the court did not in its charge sufficiently marshal the evidence applicable to him. He did not request that this be done, undoubtedly because his attorney did so skillfully, presenting the evidence against him in its most favorable light.
 
 X. Sternkopf's Sentence
 
 139
 Sternkopf contends that the $20,000 fine imposed on him was improper because the sentence was a general one and the maximum on any single count was $10,000.00. He cites no authority for this proposition. The maximum fine in a general sentence may be determined by aggregating the maximum under each valid count. See e.g., Peoples v. United States, 412 F.2d 5, 6 (8th Cir. 1969); United States v. Woykovsky, 297 F.2d 179, 181 (7th Cir. 1961), cert. denied, 369 U.S. 867, 82 S.Ct. 1034, 8 L.Ed.2d 86 (1962); Robles v. United States, 279 F.2d 401, 407 (9th Cir. 1960), cert. denied, 365 U.S. 836, 81 S.Ct. 750, 5 L.Ed.2d 745 (1961). In United States v. Rose, 215 F.2d 617, 630 (3d Cir. 1954) we said "We are strongly of the opinion that it is highly desirable that the trial judge in imposing sentence on an indictment containing more than one count deal separately with each count." The affirmance should not be construed as any change in our view as to the desirability of separate treatment.
 
 
 140
 The judgments appealed from will be affirmed.
 
 
 
 [1]
 The court sentenced defendants Whelan, Flaherty and Murphy to terms of fifteen years imprisonment; defendant Sternkopf to a term of ten years imprisonment and a fine of $20,000; defendant Kropke to a term of five years imprisonment; defendant Stapleton to a term of two years imprisonment with eighteen months of that term suspended and three years probation; defendant Kunz to a term of two years imprisonment with eighteen months of that term suspended and two years probation; defendant Wolfe to a term of five years imprisonment with the entire term suspended and five years probation
 
 
 [2]
 "Interference with commerce by threats or violence
 (a) Whoever in any way or degree obstructs, delays or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
 (b) As used in this section-
 (2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
 (3) The term 'commerce' means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction."
 
 
 [3]
 "Conspiracy to commit offense or to defraud United States
 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."
 
 
 [4]
 "Interstate and foreign travel or transportation in aid of racketeering enterprises
 (a) whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to-
 (1) distribute the proceeds of any unlawful activity; or
 (2) commit any crime or violence to further any unlawful activity; or
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
 (b) As used in this section 'unlawful activity' means . . .
 (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.
 
 
 [5]
 See pp. 1224, 1225, 1227 to 1228, infra
 
 
 [6]
 Not more than twenty years and not more than $10,000 under 18 U.S.C. Sec. 1951; not more than five years and not more than $10,000 under 18 U.S.C. Sec. 371
 
 
 [7]
 These degrees of participation were recognized in the varying sentences imposed. See Note 1 supra
 
 
 [8]
 At the time J. J. Kenny gave the testimony from which the excerpts quoted above were taken defendant J. V. Kenny had not been severed
 
 
 [9]
 Count II alleges that the conspiracy began on or about November 1, 1963 and continued up to and including the date of the indictment