**UNITED STATES of America**

v.

**Neil BYRNE et al.**

**Crim. No. 75–773.**

United States District Court,
E. D. Pennsylvania.

Oct. 12, 1976.

148

David H. Hopkins, Robert W. Merkle, Jr., Dept. of Justice, Crim. Div., Washington, D. C., for plaintiff.

Jack J. Levine, Philadelphia, Pa., for Neil Byrne.

Kenneth E. Smith, Burlington, N. J., for Daniel Cahalane.

Thomas Colas Carroll, Philadelphia, Pa., for Daniel Duffy.

## MEMORANDUM AND ORDER

BRODERICK, District Judge.

Presently before the Court are the motions of defendants Neil Byrne and Daniel Cahalane for Arrest of Judgment and/or for Judgment of Acquittal and/or for a New Trial. They have also moved for permission to inspect the grand jury minutes. After a lengthy four week trial, on June 21, 1976, the jury returned a verdict of guilty as to defendants Byrne and Cahalane and a verdict of not guilty as to defendant Daniel Duffy[1] in connection with some counts of the twenty-three count Indictment. Both Byrne and Cahalane were found guilty on Count 1 which charged them with conspiracy to export firearms without a license; defendant Byrne also was found guilty on Counts 5 and 13 which charged him with exporting firearms without a license and aiding and abetting; defendant Cahalane also was found guilty on Counts 4, 9, 11, 15 and 16 charging him with exporting fire-

---

1. Also named as defendants in the Indictment were Vincent Conlon and Thomas Regan, who are fugitives and were therefore not on trial at the time.

arms without a license and aiding and abetting.[2]

Although the defendants have alleged numerous grounds on which they base their motions, we find that only their allegation that the evidence is insufficient to support a conviction on either the substantive counts of aiding and abetting the exportation of firearms without a license and on the conspiracy count raises substantial questions.

*Sufficiency of the Evidence as to Conspiracy.*

Both defendants were charged in the indictment with conspiracy to export firearms without a license in violation of 18 U.S.C. § 371 and 22 U.S.C. § 1934(c)[3] and the regulations promulgated thereunder, 22 C.F.R. Section 127.01.[4] The theory on which the government proceeded at trial was that although the facts and circumstances relating to the manner in which the firearms left the country were not known, the evidence and the inferences which can be drawn from it are sufficient for the jury to find beyond a reasonable doubt that the defendants conspired to export the firearms without a license.

The evidence produced at trial, viewed in a light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Armocida*, 515 F.2d 29 (3d Cir. 1975), *cert. denied* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84, is sufficient to establish that the defendants had knowledge of a plan to export firearms without a license, entered into an agreement to further that plan, and performed acts to further the illicit purpose. Although the evidence is of a circumstantial nature, we find it sufficient to permit the jury to infer the existence of a widespread conspiracy to purchase arms and export them illegally to Ireland and the defendants' participation in it.

■ To support a conspiracy conviction, the government must show both an agreement and a specific intent to achieve some unlawful goal. *United States v. Klein*, 515 F.2d 751, 753 (3d Cir. 1975). The defendants contend that under the facts of this case the evidence is insufficient to support a verdict of guilty as to the conspiracy count in that there is no evidence that a

---

**2.** All three defendants were also charged with acting as an agent of a foreign government without prior notification to the Secretary of State in violation of 18 U.S.C. § 951. The Court granted the defendants' motion for judgment of acquittal at the close of the government's case as to the three Counts charging this offense.

**3.** 22 U.S.C. § 1934 provides in pertinent part:

(a) The President is authorized to control, in furtherance of world peace and the security and foreign policy of the United States, the export and import of arms, ammunition, and implements of war . . . other than by a United States Government agency. The President is authorized to designate those articles which shall be considered as arms, ammunition, and implements of war . . . *for the purposes of this section.*

(b) As prescribed in regulations issued under this section, every person who engages in the business of manufacturing, exporting, or importing any arms, ammunition, or implements of war, including technical data relating thereto, designated by the President under subsection (a) of this section shall register with the United States Government agency charged with the administration of this

section, and, in addition, shall pay a registration fee which shall be prescribed by such regulations.

· · · · ·

(c) Any person who willfully violates any provision of this section or any rule or regulation issued under this section, or who willfully, in a registration or license application, makes any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be fined not more than $25,000 or imprisoned not more than two years, or both.

**4.** 22 C.F.R. Section 127.01 provides in pertinent part:

It shall be unlawful for any person to export or attempt to export from the United States any of those articles on the U. S. Munitions List without first having obtained a license therefor, unless written approval was obtained from the Department of State or an exemption from this requirement is authorized by this subchapter.

All of the weapons charged in the indictment, which are identified by serial number, are on the United States Munitions List.

common purpose existed. In *United States v. Kates*, 508 F.2d 308, 310–311 (3d Cir. 1975), the Third Circuit stated:

> It is well stated that the "gist" of a conspiracy is an agreement. However slight or circumstantial the evidence may be, it must, in order to be sufficient to warrant affirmance, tend to prove that the appellant entered into some form of agreement, formal or informal, with his alleged co-conspirators. Similarly, we have stated that the essence of a conspiracy is a "unity of purpose" or "common design." [Footnote omitted].

In explaining the nature of the agreement necessary to prove a conspiracy, the Third Circuit, in *Kates*, further stated:

> [A] formal agreement need not be established; rather, a defendant's involvement in the conspiracy may be inferred from circumstantial evidence. The Government need not show that the defendant participated in every transaction or even that he knew the identities of his alleged conspirators or the precise role which they played. Id. at 310. [Footnotes omitted].

 The defendants also contend that neither defendant Byrne nor defendant Cahalane had any knowledge of the conspiracy's illicit purpose when they performed the acts described in the indictment and proved at trial. There is no question that in order to sustain a conviction for conspiracy the evidence must be sufficient for the jury to reasonably infer that the alleged conspirator had knowledge of the conspiracy's illicit purpose when he performed the acts in furtherance of the illicit purpose. This requirement is set forth by our Third Circuit in *United States v. Klein*, supra, in the following language:

> To support a conspiracy conviction, the government must show both an agreement and a specific intent to achieve some unlawful goal. *United States v. DeCavalcante*, 440 F.2d 1264, 1275 (3d Cir. 1971); *United States v. Borelli*, 336 F.2d 376, 384 (2d Cir. 1964). We do not dispute that a party who associates himself with an ongoing conspiracy may become a party to that agreement, either expressly by agreement or implicitly by acts done in furtherance of that conspiracy. *Direct Sales v. United States*, 319 U.S. 703, 709, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943); *United States v. Lester*, 282 F.2d 750, 753 (3d Cir. 1960). At a minimum, however, it must be shown that such a person has knowledge of the conspiracy's illicit purpose when he performs acts which further that illicit purpose. *Direct Sales*, supra; *United States v. Salerno*, 485 F.2d 260, 263 (3d Cir. 1973); *United States v. American Radiator & Standard Sanitary Corporation*, 433 F.2d 174 (3d Cir. 1970). By acting in furtherance of the co-conspirators' goals with knowledge of the improper purpose, the jury can reasonably infer that the new member has achieved a tacit agreement with members of the ongoing conspiracy. Without knowledge of some improper purpose, the agreement, which is the heart of any conspiracy indictment, cannot be inferred from acts, even acts which further the purpose of the conspiracy. *United States v. Kates*, 508 F.2d 308 (3d Cir. 1975). 515 F.2d at 753. [Footnotes omitted].[5]

As the Court pointed out, such knowledge may be shown by circumstantial evidence "especially in a conspiracy case where direct evidence is likely to be scant." 515 F.2d at 754. [Footnote omitted]. Furthermore, in the face of a guilty verdict, only "slight" evidence is required to link a particular defendant to an established conspiracy. *United States v. Hopkins*, 518 F.2d 152 (3d Cir. 1975), citing *Kates*, 508 F.2d at 310.

 The evidence introduced by the Government establishes the existence of a conspiracy to export guns and ammunition without a license lasting over several years and involving more than a dozen persons. The Government proved that the defendants, along with the co-conspirators, purchased several hundred firearms and nearly 100,000 rounds of ammunition at a cost in

---

5. *See also United States v. Johnson*, 513 F.2d 819, 823 (2d Cir. 1975).

excess of $25,000. Other evidence, primarily circumstantial, shows patterns of overt, as well as clandestine, efforts to purchase weapons to be shipped to Northern Ireland for the use of the Provisional Irish Republican Army (IRA). The fact that much of the evidence is circumstantial does not affect its probative value, for circumstantial evidence is indistinguishable from direct evidence insofar as the jury's fact-finding function is concerned. *United States v. Hamilton*, 457 F.2d 95, 98 (3d Cir. 1972). "[E]vidence need not be inconsistent with every conclusion save that of guilt, provided it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt." *Id.*, quoting *United States v. Giuliano*, 263 F.2d 582, 584 (3d Cir. 1959). Examining the evidence in a light most favorable to the Government, we can summarize it as follows:

Jeff Reh testified that he first met defendant Duffy in July of 1970 while they both worked as auto mechanics at Rudy Valentino Ford in Upper Darby, Pennsylvania. (N.T. 11–99). Duffy was emotionally involved in the struggle in Northern Ireland, and often became agitated when he read articles in the newspaper concerning the events in Northern Ireland. (N.T. 11–103; 11–117). Duffy, who knew that Reh was a member of the Army Reserves, asked Reh if he could obtain firearms, rocket launchers, hand grenades and ammunition for him that would be shipped to the people in Northern Ireland from New York. (N.T. 11–105; 11–107). According to Reh's testimony, Duffy said that money was no object because "they" had plenty of money. (N.T. 11–106). Duffy said that the money was raised at different dances and society-type affairs. (N.T. 11–106—107). Although Duffy mentioned the IRA, he said he was not a member because a person had to live in Ireland to be a member. (N.T. 11–108). Reh told Duffy that he could not supply the weapons Duffy requested, but put Duffy in touch with one of his friends, Jack Nigro. (N.T. 11–109). In August of 1972, Reh saw Nigro in a shopping center and told him that a co-worker was interested in obtaining weapons for money. (N.T. 11–110—111).

Nigro testified that as a result of the conversation with Reh, he received a call from Duffy on October 3, 1972. (N.T. 11–132). He had some discussion with Duffy concerning the possibility of Nigro's supplying "arms and stuff" on a large scale, but Duffy said he didn't want to discuss the matter on the phone. (N.T. 11–150—152). Duffy said that the "stuff" would leave the country, and that once received, it would leave the country in a week or ten days. (N.T. 11–152). Duffy also told Nigro that funds were available, (N.T. 11–152), but that he did not have the final word on anything. (N.T. 11–153). After a subsequent conversation about two weeks later, Nigro and Duffy arranged to meet on October 20, 1972, outside of Duffy's place of employment. (N.T. 11–154—155). At that time Duffy said they wanted Armalite rifles, Colt AR–15's, and rifles that could penetrate British flak vests and rocket launchers and mortars to use against the British tanks and armored cars. (N.T. 11–156). Nigro testified that Duffy said he was working for the IRA and cooperating with the Irish Northern Aid Committee in purchasing firearms. (N.T. 11–157). Duffy said that there were funds available from the Irish Northern Aid Committee to purchase arms and that he would speak to someone from New York whom he identified as "the General" about the firearms purchase. (N.T. 11–157). Nigro testified that Duffy said that he had purchased weapons in the past using identifications of recently deceased Irishmen. (N.T. 11–158). Duffy said they had previously used air freight, but were now running into problems with customs and were using ships out of New York to take the arms directly to Ireland. (N.T. 11–158). Duffy also said that they had to be very careful because Scotland Yard was cooperating with the FBI and "the heat was on." (N.T. 11–159).

At this meeting, they agreed that Nigro should meet "the General" from New York. (N.T. 11–159). Duffy called Nigro the following week, saying that he had arranged a

meeting for November 6, 1972 between Nigro and a man from Warminster. (N.T. 11–159). At that meeting, Duffy introduced defendant Byrne as a very high ranking member of the IRA. (N.T. 11–163). Byrne said that the arms he wished to purchase were for his homeland and would be shipped directly to Ireland through New York. (N.T. 11–165; 11–170). When discussing payment for the arms, Byrne said that he had $50,000 earmarked for arms purchases which could be procured from New York on a day's notice. (N.T. 11–169). Nigro's last communication with Duffy was several weeks after this meeting when Duffy called to ask Nigro why he hadn't gotten back to him. (N.T. 11–173). Nigro said that he hadn't located anything yet and would call him. (N.T. 11–173).

John Rugg, the General Manager of Century Arms, Incorporated, a wholesale firearms dealer, testified that he sold Lee Enfield rifles and ball ammunition to Marjorie Palace, an unindicted co-conspirator who did business as a retail firearms dealer under the name of Palace Firearms. (N.T. 2–1—5; 2–192). Palace testified that she and her husband sold firearms from their home in Morrisville, Pennsylvania (N.T. 3–120), and that she sold firearms and ammunition to defendants Byrne and Cahalane (N.T. 3–139; 3–181), as well as to other co-conspirators. (N.T. 3–176; 3–180). She testified that her records showed that she sold 5 rifles to Byrne, 25 to Cahalane, 33 to Regan, and 140 to Conlon, making a total of 203 rifles purchased by the defendants and the co-conspirators from Palace Firearms. Rugg testified that Palace told him that she was selling these guns to collectors who preferred the rifles to be left in their original grease. (N.T. 2–131; 3–7). Rugg testified that rifles are put in grease for long periods of storage or for overseas shipment. (N.T. 2–131). Frank Moyer, an agent with the United States Treasury Department, Bureau of Alcohol, Tobacco and Firearms (ATF), who was qualified as a firearms expert, testified that wholesalers do not customarily pack firearms in grease for distribution to dealers in the United States, and that packing a firearm in grease would

be appropriate for overseas shipment. (N.T. 9–185). Palace told Rugg that she was in a hurry for a delivery because Palace Firearms had been advertising a sale in a newspaper. (N.T. 3–4).

Robert Smith, a firearms dealer, testified that he sold armor-piercing ammunition to Palace. (N.T. 3–13). This ammunition was later sold by Palace to the co-conspirators. Palace told Smith that she wanted the armor-piercing ammunition because she had a contract with a police department in Trenton or Camden, New Jersey to supply ammunition for training purposes, for which a Federal grant had been issued. (N.T. 3–17—18; 3–40). Fred Ecker, a lieutenant with the New Jersey State Police in the purchase and property control unit stationed in West Trenton, New Jersey, testified that the New Jersey State Police never used armor-piercing ammunition and never had a contract with Mrs. Palace to acquire such ammunition. (N.T. 3–45; 3–51). Dominic Limone, a training supervisor of the Police Academy of the Trenton, New Jersey State Police Department, testified that the police never used armor-piercing ammunition and never contracted with Mrs. Palace for that ammunition. (N.T. 3–52—53). Richard Taylor, a sergeant in charge of the training bureau of Hamilton Township Police Department, which township is a suburb of Trenton, New Jersey, testified that the Police Department had never entered into a contract with Mrs. Palace to acquire armor-piercing ammunition. (N.T. 3–53—54). Robert Plaag, a Captain of the Police Department of Ewing Township, which is adjacent to Trenton, New Jersey, testified that he had no dealings with Mrs. Palace concerning the supply of armor-piercing ammunition and that the Police Department never used armor-piercing ammunition. (N.T. 3–55—56). Edward Hahn, a sergeant in charge of property management, equipment and supplies for the Camden, New Jersey Police Department, testified that the Camden Police Department has not ordered armor-piercing ammunition for the past ten years, he never observed any police department in the Camden area using armor-piercing ammunition, and that

he had never heard of Mrs. Palace. (N.T. 3–95—97).

Palace testified that she assumed the weapons purchased were going to be used by a gun club. (N.T. 4–56). Frank Moyer, the firearms expert, testified that the Armalite AR–180 is a semi-automatic weapon not used for sport and is particularly suitable for urban combat situations. (N.T. 9–174; 9–183). He testified that its effective accurate range is about 450 yards, that its maximum effective range is about 1800 yards, and that it will disintegrate a cinder block wall. (N.T. 9–178). He testified that the Lee Enfield Number 4 Mark I is a popular military weapon not used for hunting. (N.T. 9–182—184).

Marie Hallowell, bookkeeper at Montgomery Loan Company, a firearms and sporting goods store, testified that Conlon, Byrne and Cahalane came into the store together on several occasions to purchase Armalite AR–180 weapons. (N.T. 2–79—83). She testified that payment was made in cash. (N.T. 2–84). The firearms records of Montgomery Loan show that it sold 21 weapons to Byrne, 94 weapons to Cahalane, 15 to Regan, 35 to Conlon, and 10 to McNichol, making a total of 175 rifles purchased by the defendants and the co-conspirators from Montgomery Loan.

The Government proved that 378 weapons were purchased by the defendants and the co-conspirators. Of this total, 26 were purchased by Byrne, 119 by Cahalane, 175 by Conlon, 10 by McNichol and 48 by Regan.

The Government brought into the courtroom and introduced into evidence 137 weapons. (N.T. 6–121; 9–217). In addition, the Government introduced photographs of 27 weapons (N.T. 9–88), and produced evidence as to 16 additional weapons. (N.T. 9–81). Of these 180 weapons, 78 were British Enfield rifles, 91 were Armalite rifles, 7 were Plainfield Machine Works M–1 rifles and 4 were M–1903 rifles.

Victor Beavis, a principal officer of the Firearms Section of the Department of Industrial and Forensic Science located in Belfast, Northern Ireland, testified that the Royal Ulster Constabulary and the Royal Military Police send weapons to the Firearms Section which stores the weapons, examines them, and gives testimony in Court about them. (N.T. 6–81; 6–110). Beavis testified that all weapons are accompanied by a form which sets forth the serial number, caliber and type of weapon. (N.T. 6–86). These forms are examined by someone in the Department to insure that the information on the form corresponds with the information on the weapon.

Beavis testified that the serial numbers of the 137 guns introduced in evidence matched the serial numbers on the forms of the Department of Industrial and Forensic Science, and that all of the guns in evidence had been turned over to his Department by the Royal Irish Constabulary and the Royal Military Police in Northern Ireland. (N.T. 6–89; 9–27—28; 9–40). He testified that all of these weapons had been received by his Department between May 1972 and May 1975. (N.T. 9–30—38). Beavis also testified that the Department of Industrial and Forensic Science had received 27 additional guns for inspection which could not leave the country because they were the subject of court proceedings in Northern Ireland. (N.T. 9–90). At Beavis' instruction, a photographer in the Department of Industrial and Forensic Science took pictures of these weapons. (N.T. 9–90). These photographs were identified and introduced into evidence. (N.T. 9–94). Beavis also testified that the forms of the Department of Industrial and Forensic Science showed that sixteen additional guns were recovered and were disposed of through normal channels. (N.T. 9–81; 9–84).

Raymond Hubbert, an ATF agent, testified that on the basis of the weapons' purchase records in evidence and Mr. Beavis' testimony, he prepared summary charts of the weapons purchased and the weapons received in Northern Ireland. (N.T. 14–164). One chart showed that all of the weapons that were in evidence or had been identified by Mr. Beavis were purchased by a defendant or co-conspirator and recovered in Northern Ireland. (N.T. 14–164). This

chart showed that of the total 180 weapons that had been received by authorities in Northern Ireland and turned over to the Department of Industrial and Forensic Science, 11 had been purchased by defendant Byrne, 40 had been purchased by defendant Cahalane, 90 by co-conspirator Conlon, 8 by McNichol and 31 by Regan. Another chart showed that certain weapons that were purchased together were received together by Northern Irish authorities. (N.T. 14–170).

John Casey testified that he had been a member and officer of the Irish Northern Aid Committee from 1970 to 1972. (N.T. 12–63—64). He stated that when he joined the organization he understood its purpose to be the raising of funds to help the homeless people of Northern Ireland, but that in 1971, Martin Lyons, the leader of the Irish Northern Aid Committee, told him that the policy was being changed, and that the money could be used by the people in Northern Ireland to purchase weapons. (N.T. 12–66—67). Casey testified that the purpose of the Irish Northern Aid Committee was the moving of guns and ammunition bound for Ireland, (N.T. 12–89) and testified to several occasions when he participated in crating guns and picking up guns for the Irish Northern Aid Committee. (N.T. 12–94—98). He testified that guns were always referred to as "clothing" because they didn't want to discuss the movement of guns in the open. (N.T. 12–111—112). Martin Lyons, who directed the pickup of guns (N.T. 12–112), discussed with Casey the purchase of guns in Connecticut in 1971 and the checking out of gun shops in upstate New York in 1972 (N.T. 12–105) with Frank Grady, the Chairman of an Irish Northern Aid Committee chapter. (N.T. 12–67). Lyons once told Casey that the "boys in Philly really came through for us" (N.T. 12–106), and once went to Philadelphia for a weekend with Grady. (N.T. 12–107). Lyons told Casey not to discuss anything over the phone because the Irish Northern Aid Committee phones were being tapped. (N.T. 12–102). Casey identified Cornelius Buckley, a friend of Lyons, as being present at the Irish Northern Aid Committee headquarters in the Bronx.

(N.T. 12–67). Casey testified that Grady told him that Martin Lyons dressed up as a priest to get two trunks past customs and on board a ship bound for Ireland. (N.T. 12–91).

Michael Plunkett, an ATF agent, testified that he had contact in an undercover capacity with Eugene Marley, an unindicted co-conspirator, in Syracuse, New York in the spring of 1972. (N.T. 10–11—12). Marley said he was active with the provisional wing of the IRA and that he was engaged in obtaining automatic weapons, explosives, rocket launchers and rockets for the IRA. (N.T. 10–12). He said that he was connected with an IRA group in Philadelphia (N.T. 10–13), that the organization was big in Philadelphia (N.T. 10–29), and that he would have to get the okay for the money from Philadelphia. (N.T. 10–29). Marley said that he made phone calls to his Philadelphia contact on Sundays. (N.T. 10–30). His telephone toll records show a pattern of Sunday calls to a Mr. Corry, to whose home Cahalane was traced by surveillance. (N.T. 14–134—135). Marley arranged to have a truck available to pick up some weapons which were to be delivered on June 19, 1972 near Binghamton, New York, after which they would be taken to the Bronx in New York City. (N.T. 10–23—24). As a result of surveillance, Richard Weller and Robert Hutt, ATF agents, observed Marley entering a hotel in Kirkwood, New York on June 20, 1972. (N.T. 10–51—53). He met with two men who arrived in a van truck. (N.T. 10–52—54). The men in the van were later stopped by Paul Starck, a New York state policeman, in response to a request by ATF agent Noel Haera, who participated in surveillance of the meeting in the motel. (N.T. 10–110—111). Starck testified that the driver of the van produced a New York State driver's license in the name of Cornelius Buckley and a registration showing that the vehicle was owned by Martin Lyons. (N.T. 10–74). The other man in the van produced a driver's license in the name of Martin Lyons. (N.T. 10–74).

William Kavanaugh, an ATF agent acting in an undercover capacity representing

that he had weapons for sale, testified that on July 8, 1972, he was at a meeting in the Bronx, New York City, attended by Ted Carroll, Martin Lyons, and Cornelius Buckley. (N.T. 12–32). Carroll had previously identified himself as Colonel Carroll of the IRA (N.T. 12–24) and Lyons and Buckley said they were members of the IRA. (N.T. 12–44). At that meeting they discussed with Kavanaugh the purchase from him of antitank rockets, grenade launchers, grenades and machine guns which they said were needed to knock out the armored cars used by the British. (N.T. 12–33—34). Agent Kavanaugh was shown the cash needed for the purchase, which was $11,300. (N.T. 12–37). Lyons said that the weapons would be crated as plumbing material for shipment to Northern Ireland. (N.T. 12–39).

Thomas Clark, an ATF agent, testified that he observed Byrne and Cahalane entering Lyons' residence in the Bronx, New York on November 30, 1972 and on January 30, 1973. (N.T. 14–142—152).

James Kelly, an ATF agent, testified that he observed Byrne and Cahalane leaving Cahalane's residence on January 27, 1972 at 8:30 p. m. and that Byrne removed several rifles and a canister used by the military to carry ammunition from the trunk of his car and put it in Cahalane's car. (N.T. 13–115—118). Kelly also testified that on March 2, 1973, he observed Cahalane and Byrne at the Palaces' residence and place of business at 8:00 p. m. loading boxes of weapons into Cahalane's car. (N.T. 13–119—126).

Thomas Lydon, an ATF agent, testified that on February 23, 1973, he saw cardboard cartons being unloaded from a car with New York license plates and taken inside Forney's Gun Shop in Penndel, Pennsylvania. (N.T. 14–90—92). On February 26, 1973, he observed Donald Palace, Marjorie Palace's husband, put the same boxes into Palace's car. (N.T. 14–94). On March 2, 1973, he saw the same cartons being loaded at Palace's residence by Byrne and Cahalane into Cahalane's car. (N.T. 14–96—97). On March 24, 1973, Agent Lydon observed, on the rear of a truck used by Cahalane in his business, cartons similar in appearance. (N.T. 14–103).

■ The defendants contend that the evidence, which we have summarized above, is insufficient for the jury to have found that there was an agreement of which they had knowledge and claim that the evidence established no more than "knowledge of shadowy dealings", which is insufficient to infer that Byrne and Cahalane were part of the conspiracy. *United States v. Kates, supra,* 508 F.2d at 312. However, we find that there was sufficient evidence from which the jury could reasonably find the existence of an agreement to export weapons without a license and the defendants' knowledge and participation in the conspiracy.

*Sufficiency of Evidence as to Substantive Counts.*

The defendants also claim that the evidence is insufficient to support their conviction on the substantive counts of aiding and abetting the exportation of firearms without a license. As stated before, it was the Government's theory that even though it produced no evidence concerning the manner of export,[6] the evidence is sufficient for the jury to find beyond a reasonable doubt that the firearms were exported without a license and that the defendants knowingly aided and abetted the illegal transportation.

■ In order to convict a defendant of aiding and abetting the commission of a crime, the Government must prove two essential elements. First, that the substantive crime has been committed, *United States v. Tornabene,* 222 F.2d 875, 878 (3d Cir. 1955), and, second, that the defendant charged with aiding and abetting had knowledge of the commission of the substantive offense and acted with the intent to facilitate the commission of such offense. *United States v. Cades,* 495 F.2d 1166,

---

6. Count 4 of the indictment, for example, charges that "in a manner to the Grand Jury unknown", Cahalane "knowingly, willfully and unlawfully transported and caused to be transported" the firearms.

1167–1168 (3d Cir. 1974); *United States v. Docherty*, 468 F.2d 989, 992 (2d Cir. 1972). See *United States v. Bryan*, 483 F.2d 88 (3d Cir. 1973); *United States v. Provenzano*, 334 F.2d 678 (3d Cir.), *cert. denied* 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964). The defendants contend that the Government produced insufficient evidence to prove either of these two essential elements.

Although we have already found that there is sufficient evidence in the record for the jury to reasonably find Byrne and Cahalane guilty of the conspiracy count, we now find that even when looking at the evidence in a light most favorable to the Government, the Government failed to produce evidence sufficient for the jury to find beyond a reasonable doubt that the offense of exporting firearms without a license was committed by anyone. As heretofore discussed, an essential element of the crime of aiding and abetting is proof that the offense was committed by someone.

■ As stated by the Supreme Court in *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946):

It has been long and consistently recognized by the Court that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses. . . . The agreement to do an unlawful act is even then distinct from the doing of the act. [Footnotes omitted].

Our Third Circuit in *United States v. Pappas*, 445 F.2d 1194 (3d Cir. 1971) said:

*Pinkerton v. United States* makes clear that the crime of conspiracy is separate and distinct from a related substantive crime. (Citations omitted).

In *United States v. Sall*, 116 F.2d 745 (3d Cir. 1940), which held that although the evidence in the case was sufficient to support a conspiracy conviction, it was not sufficient to support a conviction on the substantive count, Judge Maris pointed out:

This is for the reason that the gist of the crime charged by the conspiracy count was his agreement or combination with the other defendants to effect the unlaw-

ful object of the conspiracy and not the commission of the overt acts which followed.

In the present case the circumstantial evidence which we have recited was undoubtedly sufficient to support the inference drawn by the jury that the defendant Sall was a member of the conspiracy . . . . We do not think, however, that the government's evidence was sufficient to support the inference that the defendant Sall knowingly and with criminal intent participated . . . (in the substantive offense). The evidence does not exclude the possible inference that . . . (the substantive offense was committed) by others without the knowledge of the defendant Sall. 116 F.2d at 747–748.

We have no question that the Government produced ample proof that Byrne purchased the 11 M–1903 rifles described in Count 5 of the indictment from Montgomery Loan Company on January 14, 1972 and that the one rifle he is charged in Count 5 with exporting without a license was turned over to the Department of Industrial and Forensic Science by either the Royal Ulster Constabulary or the Royal Military Police in Belfast, Northern Ireland on April 29, 1974. However, the record is devoid of any evidence as to how or who transported that weapon to Northern Ireland. Likewise, the Government produced ample proof that on March 21, 1972, Byrne purchased 10 Armalite AR–180 auto-loading rifles specified in Count 13 of the indictment from Montgomery Loan Company and that the 7 rifles he is charged in Count 13 with exporting to Northern Ireland without a license were turned over to the Department of Industrial and Forensic Science between April 3, 1973 and October 18, 1974. However, as to those 7 weapons, no evidence was produced concerning the manner or by whom they were exported.

The same is true of the Counts charging Cahalane with transporting weapons to Northern Ireland without a license. In Count 4 he is charged with purchasing 5 Armalite AR–180 auto-loading rifles and 4

M–1903 rifles on January 14, 1972. The Government proved that the weapons were purchased by him from Montgomery Loan Company and that 3 of the Armalite rifles and 3 of the M–1903 rifles that the defendant is charged with transporting without a license were turned over to the Department of Industrial and Forensic Science between February 22, 1973 and January 21, 1975. However, the Government produced no evidence as to how or by whom they were exported.

In Count 9 Cahalane is charged with purchasing 15 Armalite AR–180 auto loading rifles and transporting 14 of them without a license. The Government proved that all of the guns were purchased on January 28, 1972 from Montgomery Loan Company and that 14 were turned over to the Department of Industrial and Forensic Science between May 17, 1972 and June 16, 1975, but offered no evidence as to how or by whom the weapons were transported.

In Count 11 Cahalane is charged with purchasing 15 Armalite AR–180 auto-loading rifles and with transporting 13 of them without a license. The Government proved that all 15 rifles were purchased on March 10, 1972 from Montgomery Loan Company. The Government adduced no proof, however, concerning the manner or by whom they were exported.

In Count 15 the indictment charges that Cahalane purchased 5 Armalite AR–180 auto-loading rifles and transported 4 of them without a license. Even though the Government proved that all the weapons were purchased on March 21, 1972 from Montgomery Loan Company and that 4 were received by the Department of Industrial and Forensic Science between September 3, 1973 and January 23, 1975, it did not offer any evidence as to how or by whom the weapons were transported.

Count 16 charges Cahalane with purchasing 25 Armalite AR–180 auto-loading rifles and transporting, without a license, 5 of those weapons. Proof at trial established that the weapons were purchased on April 5, 1972 from Montgomery Loan Company and came into the possession of the Depart-

ment of Industrial and Forensic Science between April 3, 1973 and April 9, 1974, but there was no evidence as to the manner and by whom they were exported.

The Government's proof of exporting without a license was limited to the introduction of a document from the Department of State showing that for the period from January 1, 1969 to March 3, 1976, no record existed concerning the issuance of any export license to Byrne, Cahalane, Conlon, McNichol, Regan or Duffy. However, the record in this trial is completely devoid of any testimony by the Government showing that no license or licenses were issued in connection with the export of any of the firearms described in the indictment.

 It is the contention of the Government that since the evidence shows that the weapons were purchased by the defendants or the co-conspirators; that the weapons came into the hands of the authorities in Northern Ireland; and that there were overt and clandestine meetings and discussions concerning the lawful and unlawful purchase of weapons, the jury could reasonably infer that the weapons described in the indictment were exported without a license. The Government specifically points to the testimony of Reh and Nigro. Nigro testified that Duffy said they were running into problems with customs and that Scotland Yard was cooperating with the FBI. However, to sustain its burden, the Government was required to prove either by circumstantial or direct evidence that the firearms described in the indictment were exported without a license. This the Government failed to do. The Government failed to produce one scintilla of evidence concerning the illegal exportation of the weapons described in the indictment. This total lack of evidence we find to be fatal to the Government's case, as to the substantive counts. As we have heretofore pointed out, however, the evidence is sufficient for the jury to find the defendants Byrne and Cahalane guilty on the conspiracy count in that the evidence is amply sufficient for the jury to find beyond a reasonable doubt that the defendants conspired to export firearms

without a license. To support a conspiracy conviction, the Government must show an agreement and specific intent to achieve an unlawful goal. The evidence in this case does establish the existence of a conspiracy to export guns without a license, although it fails to show how or by whom the specific guns described in the indictment were exported. It is well-established that in order to find one guilty of conspiracy, it is not necessary for the Government to show that the conspiracy was successful; as a matter of fact, the proof may show that the conspiracy failed. However, such is not the case for aiding and abetting. To support an aiding and abetting charge the Government must produce evidence from which the jury can find beyond a reasonable doubt that someone committed the crime, i. e., that in this case, someone exported without a license the weapons described in the indictment.

■ Although "the jury is permitted to infer from one fact the existence of another essential to guilt, if reason and experience support the inference", *Tot v. United States,* 319 U.S. 463, 63 S.Ct. 1241, 1244, 87 L.Ed. 1519 (1943),[8] it is well-settled that the Court cannot permit the jury to rely on conjecture or speculation in arriving at its verdict. *United States v. Heithaus,* 391 F.2d 810 (3d Cir. 1968); *United States v. Cockerill,* 366 F.Supp. 856 (S.D.Ill.1973). We believe that the jury was required to speculate as to whether the weapons described in the indictment were, in fact, exported by anyone without a license and that the evidence produced at trial invites such conjecture.

The Government also contends that since it proved "specific acts of the defendants to aid and abet an export and an inescapable inference of intent to export illegally, that none of the defendants had a license to export, and that the weapons in question were in fact exported, the burden of proceeding shifted to the defendants to advance a defense that someone else possessed the necessary license as that information, if a fact, was peculiarly within their knowledge." [9]

■ We again point out that these defendants were charged with aiding and abetting in connection with the export of guns without a license. As we have heretofore stated, the burden was on the Government to prove that someone committed the crime of exporting without a license. The Government's argument that the burden of proceeding shifted to defendants to advance a defense that someone else possessed a license is in no way supported by the cases cited by the Government and this Court knows of no theory of criminal law which would relieve the Government from the burden of proving that the guns were exported without a license.

In support of its contention, the Government appears to place reliance on *United States v. Fleischman,* 339 U.S. 349, 70 S.Ct. 739, 94 L.Ed. 906 (1950); *Morrison v. People of California,* 291 U.S. 82, 54 S.Ct. 281, 78 L.Ed. 664 (1934); and *Rossi v. United States,* 289 U.S. 89, 53 S.Ct. 532, 77 L.Ed. 1051 (1933). Although the more recent decisions of our Supreme Court appear, for the most part, to have discredited the theory expressed by these cases that the burden in a criminal case shifts to the defendant as to facts which could more conveniently be proved by a defendant,[10] there is no factual basis in this case for claiming that it would

---

8. *See United States v. Strickland,* 509 F.2d 273 (5th Cir. 1975); *United States v. Pichany,* 490 F.2d 1073, 1078–79 (7th Cir. 1973).

9. Letter of Government dated July 20, 1976.

10. In suggesting that information concerning possession of a license by someone other than the defendants is a fact peculiarly within the knowledge of the defendants and therefore justifies shifting the burden to the defendants, the Government appears to rely on the "conve-

nience test". In *Leary v. United States,* 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), the Supreme Court reviewed its holding in *Tot v. United States,* 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943), in which it stated that a statutory presumption is valid when there is a rational connection between the fact proved and the fact presumed. The Supreme Court in *Leary* cited *Morrison v. California,* 291 U.S. 82, 54 S.Ct. 281, 78 L.Ed. 664 (1934) an example of the "convenience test" and said:

have been more "convenient" for the defendants to prove that someone possessed a license to export the guns in question. Not only would such knowledge be more readily available to the United States Government, i. e., that no one had a license to ship these guns, but the cases make it abundantly clear that the Government had the burden of proving that the guns were exported without a license. It is the State Department which issues licenses for exporting weapons. In this case the only evidence presented by the Government was that the three defendants on trial, the two defendants who were fugitives, and one of the two unindicted co-conspirators named in the indictment did not have a license. We take no issue with the rule cited by the Government that the burden is on the defendants to establish that they come within an "exception" to the statute that requires a license to export the weapons in question, *McKelvey v. United States,* 260 U.S. 353, 43 S.Ct. 132, 67 L.Ed. 301 (1922); *United States v. Rosenberg,* 515 F.2d 190, 199 (9th Cir. 1975), *cert. denied* 423 U.S. 1031, 96 S.Ct. 562, 46 L.Ed.2d 404; *United States v. Chodor,* 479 F.2d 661, 663 (1st Cir.), *cert. denied,* 414 U.S. 912, 94 S.Ct. 254, 38 L.Ed.2d 151 (1973). We emphasize, however, that in this case we are not dealing with any "exception" or "exemption" to the statute. It was the Government's burden to prove, beyond a reasonable doubt, all of the elements of the crime of aiding and abetting the exportation of particular weapons, which, in this case, required proof that someone committed the substantive offense of exporting the guns described in the indictment without a license.[11]

The Tot Court reduced to the status of a "corollary" another test which had some support in prior decisions: whether it was more convenient for the defendant or for the Government to supply proof of the ultimate fact which the presumption permitted to be inferred. [Footnotes omitted]. 89 S.Ct. at 1547.

Later in this opinion, the Supreme Court in *Leary* said:

However, we consider that this approach, which closely resembles the test of comparative convenience in the production of evidence [citing Morrison] was implicitly abandoned in Tot . . . . . [W]hile recognizing (in Tot) that "the defendants . . . knew better than anyone else whether they acquired the firearms or ammunition in interstate commerce", 319 U.S., at 469, 63 S.Ct., at 1246 [87 L.Ed., at 1525], the Court held that because of the danger of overreaching it was incumbent upon the prosecution to demonstrate that the inference was permissible before the burden of coming forward could be placed upon the defendant. 89 S.Ct. at 1552.

The Government also relies on the following Statement in Underhill, Criminal Evidence, Sixth Edition (1973), ¶ 53, p. 115:

But if a fact is peculiarly within the knowledge of the accused, as his own age when he pleads nonage as to a defense or that he has a license to carry on an otherwise prohibited business or do an otherwise forbidden act, the burden of proof generally rests on him.

The most recent case cited in Underhill to support this statement is *Communist Party of United States v. United States,* 118 U.S.App. D.C. 61, 331 F.2d 807, 814 (1963), cert. denied, 377 U.S. 968, 84 S.Ct. 1646, 12 L.Ed.2d 737 (1964). However, *Communist Party* relies on the now discredited case of *Morrison v. California,* 291 U.S. 82, 54 S.Ct. 281, 284, 78 L.Ed. 664 (1934).

11. In *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 1891, 44 L.Ed.2d 508 (1975), the Supreme Court reaffirmed its holding in *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970) that the due process clause of the Fourteenth Amendment requires the Government to prove beyond a reasonable doubt every fact necessary to constitute the crime the defendant is charged with committing. *Mullaney* explains that although in a criminal case the Government generally bears both the production burden and the persuasion burden, in some *particular* instances the Government is aided by a presumption or a permissible inference which must meet exacting standards of due process. In each of the cases where the production burden is shifted, the ultimate burden of persuasion by proof beyond a reasonable doubt remains on the prosecution. 95 S.Ct. at 1891–1892, n.'s 31, 32. However, *Mullaney* establishes no general rule permitting the production burden to shift; only specific instances of procedural devices set forth in statutory form or well recognized by historical custom are recognized. In striking down a Maine statute which required a defendant in a murder case to prove by a preponderance of the evidence that he acted in the heat of passion in order to reduce the homicide from murder to manslaughter, the Supreme Court stated:

It has been suggested that because of the difficulties in negating an argument that the homicide was committed in the heat of passion the burden of proving this fact should

*Defendants' Other Contentions.*

The defendants have alleged a great number of other errors. Many of these assignments of error were raised pre-trial and were ruled upon after oral argument and presentation of briefs. We will, however, briefly review the alleged errors, inasmuch as the record contains the arguments of both sides as well as the reasons for the Court's rulings.

*Motion in Arrest of Judgment.*

■ In support of their motion in arrest of judgment, the defendants contend that the Counts charging them with exporting firearms without a license (Counts 4, 5, 9, 11, 13, 15, 16) do not charge an offense because the indictment fails to allege that the defendants were engaged "in the business of exporting" firearms without registration which they claim is the only offense cognizable under 22 U.S.C. § 1934. This same argument was rejected in *Samora v. United States,* 406 F.2d 1095 (5th Cir. 1969). There, the defendant, charged with a violation of this statute when intercepted at the United States-Mexico border with handguns secreted in his car, claimed that one isolated act would not bring him within this statute. The Court in *Samora* said that even though 22 U.S.C. § 1934(b), *supra,* requires "every person who engages in the business of manufacturing, exporting, or importing any arms, ammunition, or implements of war . . . designated by the President under subsection (a) of this section" to register, subsection (a) of § 1934 authorizes the President to "control, in furtherance of world peace and the security and foreign policy of the United States, the export and import of arms, ammunition, and implements of war", and subsection (c) speaks in terms of "any person" who violates any rule or regulation issued under the section. 406 F.2d at 1097. 22 C.F.R. Section 127.01, promulgated pursuant to § 1934, provides that it shall be unlawful for "any person" to export from the United States any article on the United States Munitions List without first having obtained a license. Thus, *Samora* holds that neither the regulation requiring a license to export the items listed by the President nor the regulation providing for application is limited to the export by one "engaged in the business." 406 F.2d at 1097. We so conclude.

■ The defendants also contend that the substantive counts and the conspiracy count (Count 1) do not charge an offense because the indictment fails to allege the manner in which the weapons were transported from the United States to Northern Ireland. This, they allege, is an essential element of the offense. It is well established that the function of an indictment is to apprise the defendant of the charge of which he is. accused and to provide protection against reprosecution should an acquittal result. *United States v. Goldstein,* 502 F.2d 526, 529 (3d Cir. 1974); *United States v. Schartner,* 426 F.2d 470, 476 (3d Cir. 1970). An indictment is sufficient if it contains a plain, concise, and definite written statement of the essential facts constituting the offense and states all the essential elements of the offense charged. *United States v. Barbato,* 471 F.2d 918, 921 (1st Cir. 1973). As to the necessity of alleging the manner of export, 22 C.F.R. Section 121.18, promulgated pursuant to § 1934, states:

> For the purposes of this subchapter the term "export" means the sending or taking out of the United States in any manner of any article, equipment, or technical data on the United States Munitions List except as may be otherwise expressly provided in a particular context. (Emphasis added).

The manner of the export is not an essential element of the crime. We hold that the indictment sets forth a sufficient descrip-

---

rest on the defendant. No doubt this is often a heavy burden for the prosecution to satisfy. The same may be said of the requirement of proof beyond a reasonable doubt of many controverted facts in a criminal trial. But this is the traditional burden which our system of criminal justice deems essential. (Citations omitted). 95 S.Ct. at 1891.

tion of the facts and elements of the crime.[12]

*Motion for a New Trial—Pre-Trial Rulings.*

■ The defendants argue that the Court erred in failing to sever the Counts charging them with acting as an agent of a foreign government without prior notification to the Secretary of State in violation of 18 U.S.C. § 951 [13] and 18 U.S.C. § 11 [14] from the rest of the Counts, and that the Court erred in declining to rule as a matter of law prior to trial on whether the IRA was "a Body of Insurgents" as charged in the indictment and provided in 18 U.S.C. § 11. The defendants claim that the Court's pretrial ruling prejudiced them in that it permitted the Government to introduce inflammatory evidence which was not relevant to the charges in the indictment. Prior to trial the Court ruled that whether the IRA was a body of insurgents was a question of fact which should be decided by the jury and not by the Court. At the close of the Government's case, the Court granted the defendants' motion for judgment of acquittal in connection with the foreign agent Counts. After granting the motion, the Court instructed the jury to disregard any evidence concerning the question of whether the IRA was a body of insurgents. (N.T. 17–25). Furthermore, Laris Hytle, a State Department consular officer, was the only witness who gave testimony concerning the situation in Northern Ireland. (N.T. 7–17—111).[15] His testimony was relevant to the

issue and was neither inflammatory nor prejudicial.

■ The defendants argue that the Court erred in failing to exclude Jack Nigro's telephone transcript of October 3, 1972 on the grounds that the best evidence, the tape recording of the conversation, was destroyed by Nigro while he was employed as an agent of the Federal government. A pretrial hearing was held on May 20, 1976, at which time Nigro was subject to direct and cross-examination. At the conclusion of the hearing, the Court found that Nigro had not been acting as an agent of the Federal government and at trial ruled that the telephone transcript should not be excluded [16] since the tape had not been destroyed in bad faith and, if Nigro was believed by the jury, the transcript was accurate. (N.T. 11–136—139). At trial, Nigro testified as to the events surrounding the transcript (N.T. 11–144—148), and defense counsel searchingly cross-examined Nigro on every detail concerning it. (N.T. 11–182—252). We have reviewed the record and find no prejudice to the defendants in the Court's having admitted it in evidence.

■ The defendants also contend that the Court erred in not granting a pre-trial hearing to determine whether there had been any taint from alleged unlawful electronic surveillance. In response to defendants' pre-trial motion seeking an order disclosing information relevant to electronic surveillance, pursuant to 18 U.S.C. § 3504(a)(1), the Government filed an affi-

---

12. *See Etheridge v. United States,* 380 F.2d 804, 809 (5th Cir. 1967) in which a similar claim was raised and rejected in connection with an indictment similarly drafted as to these Counts.

13. 18 U.S.C. § 951 provides as follows:
 Whoever, other than a diplomatic or consular officer or attache, acts in the United States as an agent of a foreign government without prior notification to the Secretary of State, shall be fined not more than $5,000 or imprisoned not more than ten years, or both.

14. 18 U.S.C. § 11 provides as follows:
 The term "foreign government", as used in this title, includes any government, faction, or body of insurgents within a country with which the United States is at peace, irrespective of recognition by the United States.

15. Professor John Moore, a professor of International Law at the University of Virginia School of Law, testified as an expert in the field of international law. (N.T. 7–127—193). Jay Mallin, a journalist, testified as an expert in the area of unconventional warfare. (N.T. 11–5—69). Neither witness gave any testimony directly concerning any event in Northern Ireland.

16. The defendants rely on *United States v. Harrison* 173 U.S.App.D.C. 260, 524 F.2d 421 (1975) and *United States v. Bryant,* 142 U.S. App.D.C. 132, 439 F.2d 642 (1971). Both of these cases discuss the responsibility to maintain materials on the part of a government "agent".

davit by David H. Hopkins, an attorney in the Criminal Division of the Department of Justice, who was assigned to prepare and try this case. This affidavit stated that he had turned over to defense counsel transcripts of two electronic overhearings of persons who might have been defendants. It further stated that no evidence in the case was the primary product of an unlawful act. On May 6, 1976, the Court denied the defendants' motion for a hearing, conditioned on the Government's agreement to set forth a more comprehensive affidavit showing the Federal agencies that were contacted by the Government. On May 11, 1976, David Hopkins complied with the Court's order by filing a supplemental affidavit setting forth the Federal agencies that were contacted. In light of the allegations of the defendants and the affidavits of the government, the failure to hold a hearing is not error. *See United States v. D'Andrea*, 495 F.2d 1170 (3d Cir. 1974).

*Evidentiary Errors.*

■ The defendants claim that the Court erred in permitting the introduction of foreign agents registration documents which were allegedly obtained in violation of defendants' Fifth Amendment rights. The Government introduced short form registration forms filed with the Department of Justice by the three defendants on trial to show motive, intent and means by which the conspiracy was effected, inasmuch as the documents evidenced that the defendants were officers of the Irish Northern Aid Committee. (N.T. 13–210—211, 14–33). The defendants objected, claiming that the documents violated their Fifth Amendment privilege of self-incrimination.[17] Their argument is as follows: After extensive communications with the Justice Department concerning the status of the Irish Northern Aid Committee in 1972 and 1973, the defendants, as officers of the Irish Northern Aid Committee, filed registration state-

ments pursuant to the Foreign Agents Registration Act of 1938, 22 U.S.C. § 611 et seq., as amended. It is the defendants' contention that at the same time the Government was investigating the Irish Northern Aid Committee to discover whether it had violated 18 U.S.C. § 951 by not registering with the Department of State. Therefore, conclude the defendants, the Foreign Agents Registration Act violates their Fifth Amendment rights. After extensive oral argument and testimony out of the presence of the jury, the Court noted that the Foreign Agents Registration Act had been subject to attack on Constitutional grounds and upheld in *Attorney General v. Irish Northern Aid Committee*, 346 F.Supp. 1384 (S.D.N.Y.1972), *aff'd* 465 F.2d 1405, *cert. denied* 409 U.S. 1080, 93 S.Ct. 679, 34 L.Ed.2d 669 (N.T. 14–35). In that case, the Court found that:

> It cannot be seriously argued that the sole or dominating purpose of the Act is to compel criminals to keep incriminating records to be used to convict the recordkeepers in subsequent criminal trials. Its purpose is to meet the Government's need for records necessary to enforce its national defense and foreign policies.
>
> And so, here disclosure of defendant's activities bears a substantial relation to a legitimate interest which is asserted by the Government to justify the disclosure. The governmental interest may fairly be said to outweigh any possible infringement of the First Amendment rights of the defendant's members or contributors. 346 F.Supp. at 1391.

In *Attorney General*, the Court distinguished *Albertson v. Subversive Activities Control Board*, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965) on the ground that the purpose of the Foreign Agents Registration Act is not to compel criminals to keep incriminating records as was found to be the case with the Act in question in *Albertson*.

17. At trial the defendants cited *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and appeared to abandon their original reliance on *Leary v. United States*, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969); *Mar-*chetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1967); and *Haynes v. United States*, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968).

As Justice Brennan, in his concurring opinion in *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 1587, 48 L.Ed.2d 39 (1976), points out: "*Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973) expressly held that the Fifth Amendment protected against the compelled production of testimonial evidence only if the individual resisting production had a reasonable expectation of privacy with respect to the evidence." (Citations omitted). No reasonable expectation of privacy could attach to the forms filled by the defendants pursuant to the Foreign Agents Registration Act. We find no error in the Court's ruling.

■ The defendants also argue that the Court erred in permitting all of the weapons received by authorities in Northern Ireland and turned over to the Department of Industrial and Forensic Science for inspection to remain in the courtroom throughout the trial inasmuch as only 51 of the 137 weapons were attributable to the defendants on trial. However, the weapons in the courtroom were all purchased by the defendants or their co-conspirators and introduced in evidence. (N.T. 6–21—22; 9–217). The weapons themselves were the central evidence in the case; in fact, several of the government's witnesses required the weapons for the presentation of their testimony. (N.T. 6–63; 6–89—91; 6–121—142; 6–151—154). Since the weapons were relevant and material to the case, any possible prejudicial effect of these items (and the defendants have not alleged any prejudice) clearly was outweighed by their probative value. *United States v. Bamberger*, 456 F.2d 1119 (3d Cir. 1972), *cert. denied* 413 U.S. 919, 93 S.Ct. 3067, 37 L.Ed.2d 1046 (1973); *United States v. Farries*, 328 F.Supp. 1034 (M.D.Pa.1971). The presence of the weapons in Court was a determination within the discretion of the trial judge and we find no abuse of discretion.[18] The defendants also claim error because three of the weapons were present in the jury room. The fact that the jury, during its deliberation, requested to see one of each type of weapon can hardly be said to have any prejudicial effect.

■ The defendants contend that the Court unduly restricted the cross-examination of Jack Nigro by prohibiting the defense from proving on cross-examination that Nigro had issued some checks which bounced. On the basis of Rule 608(b) of the Federal Rules of Evidence, the Court excluded the evidence. This Rule states as follows:

(b) Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.[19]

The Court ruled that since there had been neither an indictment nor a conviction and since the writing of checks which bounce can often occur where no criminal intent is involved, in the exercise of its discretion, it found that the matter was not probative of the witness's truthfulness. (N.T. 11–225).

■ The defendants also contend that the Court restricted the cross-examination

---

**18.** In *United States v. Johnson*, 401 F.2d 746, 747–48 (2d Cir. 1968), the Court said:

[t]he evidence was relevant; it can hardly be said in a case where a gun is used in a hold-up that the gun . . . is too prejudicial to be considered by the jury.

**19.** Prior to the adoption of the Federal rules, the case law was well-established that prior criminal acts of a witness which did not result ·

in an indictment and conviction could not be introduced to impeach a witness's credibility. *See e. g., United States v. Qualls*, 500 F.2d 1238 (8th Cir.), *cert. denied* 419 U.S. 1051, 95 S.Ct. 628, 42 L.Ed.2d 646 (1974); *United States v. Sposato*, 446 F.2d 779 (2d Cir. 1971); *United States v. Glasser*, 443 F.2d 994 (2d Cir.), *cert. denied* 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971).

of Nigro by prohibiting the defense from proving on cross-examination that Nigro had worked as an informant while he was under indictment for a firearms offense. The Court ruled that defense counsel could question the witness concerning any agreement which the witness had with the Government in connection with his testifying at the trial. (N.T. 11–212). The defense thoroughly explored Nigro's motives in working with the Government agents; rather than being restricted, defense counsel were permitted wide latitude in their cross-examination.

 The defendants claim the Court erred in permitting testimony concerning the activities of Vincent Conlon, Thomas Regan, William McNichol and Colm Frie; the acts and declarations of the following: Eugene Marley, Ted Carroll, Cornelius Buckley, Martin Lyons, John Grady, John Casey, Marjorie Palace; and the testimony of Casey concerning statements of Martin Lyons and John Grady. The defendants argue that insufficient proof was offered to demonstrate that such acts and declarations were performed pursuant to the conspiracy charged in the indictment as to defendants Byrne and Cahalane. All of those named above were alleged co-conspirators. It is well established that out-of-court statements of a co-conspirator may be admissible against other defendants upon a sufficient showing by independent evidence of a conspiracy among one or more other defendants and the declarant if the statements were in furtherance of the conspiracy. *United States v. Trotter*, 529 F.2d 806 (3d Cir. 1976). *See United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039; *United States v. Trowery*, 542 F.2d 623 (3d Cir. 1976); *United States v. Hopkins*, 518 F.2d 152 (3d Cir. 1975). In the present case there was a sufficient showing by independent evidence of a conspiracy between the defendants Byrne and Cahalane and the declarant co-conspirators. The trial court properly admitted into evidence against the defendants the declarations of the above mentioned co-conspirators.

*Errors in the Court's Charge.*

 The defendants argue that the Court erred in failing to instruct the jury on multiple conspiracies, pursuant to *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and that the Court should have charged that proof of similar enterprises linked only by a common member is not enough to establish a conspiracy encompassing all parties to all transactions. The defendants contend that the meetings and acts in Syracuse and New York City, which they claim were linked solely by the common activities of Lyons, raised the possibility of the existence of two or three conspiracies rather than one overall conspiracy. We believe there was no need to instruct the jury as to multiple conspiracies. Only one conspiracy was alleged in the indictment and only one was proved at trial, *United States v. Barrera*, 486 F.2d 333 (2d Cir. 1973), cert. denied 416 U.S. 940, 94 S.Ct. 1944, 40 L.Ed.2d 291 (1974). The dealings by the participants in the conspiracy in this case evidenced "a large general scheme, and . . . aid given by some conspirators to others in aid of that scheme." *United States v. Kenny*, 462 F.2d 1205, 1216 (3d Cir. 1972), *cert. denied* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972), cited in *United States v. Adamo*, 534 F.2d 31 (3d Cir. 1976). Furthermore, the Court stressed in its charge that the Government alleged a single conspiracy and that the Government must show that each defendant was a knowing member of this conspiracy. The possibility of "guilt transference" to which defendants allude was properly minimized by the Court's instruction that in determining whether a particular defendant was a member of the alleged conspiracy, the jury should consider only his acts and statements, for he could not be bound by the acts or declarations of other participants unless it was established that a conspiracy existed and that he was a member of it. *United States v. Salerno*, 485 F.2d 260, 263 (3d Cir. 1973), cert. denied 415 U.S. 994, 94 S.Ct. 1596, 39 L.Ed.2d 891 (1974) and cases cited therein.

■ The defendants contend that the Court erred in failing to instruct the jury that for any defendant to be convicted of conspiracy he must have known that the weapons were to be exported by a person not having a license. The Court can find no basis for this allegation of error because the Court instructed the jury that a defendant could not be convicted unless he knowingly did an act which the law forbids or knowingly failed to do an act which the law requires, purposely intending to violate the law.[20]

20. The jury, during its deliberation, asked the question:

If an individual, fully aware that the weapons he is buying are ultimately going to end up in Northern Ireland, believes that the weapons will leave the United States in a legal manner is he guilty of a conspiracy to have the weapons leave the country illegally?

And the Court answered:

Now the answer to that is "No," and I want to explain the answer so you will understand, I hope, in your further deliberations.

First of all I am going to point out that in my charge this morning I told you that a conspiracy is a combination of two or more persons by concerted action to accomplish some unlawful purpose or to accomplish some lawful purpose by unlawful means; so a conspiracy is a kind of partnership in criminal purposes in which each member becomes the agent of every other member, and that the gist of the offense is a combination or agreement to disobey or disregard the law.

As I said this morning in this case, the unlawful purpose charged in the indictment is the exporting or causing to be exported from the United States to Northern Ireland articles on the United States Munitions List without a license in violation of 22 United States Code, § 1934 and the Code of Federal Regulations, 22–127.01.

Now the Government has the burden to establish beyond a reasonable doubt that the conspiracy alleged in the indictment was willfully formed and again, as I pointed out this morning in my charge, and I am just picking out sections that I think pertain to the answer to your question, and to read that again, the Government has a burden to establish beyond a reasonable doubt the conspiracy alleged in the indictment was willfully formed, and I said to act or participate willfully means to act or participate voluntarily and intentionally and with specific intent to do something the law forbids or with specific intent to fail to do something the law requires to be done, that is to say, to act or participate with the bad purpose either to disobey or disregard the law.

I also said specific intent, as the term implies, means more than the general intent to commit the act. To establish specific intent the Government must prove that the defendant knowingly did an act which the law forbids or knowingly failed to do an act which the law requires purposely intending to violate the law.

Now I also pointed out in the charge that an act is done knowingly if done voluntarily and intentionally and not because of mistake or accident or other innocent reason, and that the purpose of adding the work "knowingly" was to insure that no one would be convicted for an act done because of mistake or accident or other innocent reason.

Now I just want to further explain, as I did this morning, by saying it is not necessary for a defendant to know the particular law which he is violating. It is not necessary for the Government to show that he read the statute or has an actual familiarity with the rules themselves; but he must intend to do the act itself which the law forbids.

Now I just want to say you recall that I gave you the elements of the conspiracy and in connection with the second element I said the second element required before a defendant may be convicted for the crime of conspiracy is that the defendant willfully became a member of the conspiracy and one may become a member of a conspiracy without full knowledge of all the details of the conspiracy, without knowledge of all the other members of the conspiracy.

On the other hand, a person who has no knowledge of a conspiracy but happens to do an act in a way which furthers the object or purpose of the conspiracy does not thereby become a conspirator and mere association with a conspirator or knowledge of the existence of a conspiracy is insufficient evidence to prove participation in the conspiracy, and the Government must establish beyond a reasonable doubt that the defendant whose case you are considering was aware of the basic purpose and the object of the conspiracy and that he entered in the conspiracy with the specific criminal intent, that is, in this case with a purpose to export from the United States any of those articles listed on the United States Munitions List without obtaining a license from the Department of State.

Just to end up, I want to also point out to you what I said in the charge and again I am just picking out sections of it which I think will help you in understanding my answer "No" that I gave to your question, and that is the summary of the conspiracy, and they are the four essential elements that the Government must prove beyond a reasonable doubt:

First, I said the conspiracy described in the indictment, that is, the exporting or causing

■ The defendants claim error in the Court's failure to instruct the jury that mere membership in the Irish Northern Aid Committee would not constitute evidence sufficient to convict any defendant of conspiracy. Although the Court has not been able to find a request to so charge, in light of the Court's extensive charge concerning the elements of conspiracy, we find no error.

■ The defendants further claim error in the Court's declining to marshal the evidence as to each alleged conspirator. We find no error or prejudice to any defendant in the Court's alleged failure to discuss the evidence applicable to each defendant.

■ The defendants argue that the Court erred in failing to caution the jury that the testimony of Jack Nigro should be examined with care if the jury believed he had attempted to induce another to testify falsely or had attempted to deceive law enforcement officers about material facts in the case. The Judge charged the jury as follows:

> Information obtained from an informant who provides evidence against a defendant for pay, or for immunity from punishment, or for personal advantage or vindication, must be examined and weighed by the jury with greater care than the information obtained from an ordinary witness. You must determine whether the informant's information has been affected by interest, or by prejudice against the defendant.

We find that the jury was sufficiently apprised of the care it should exercise in considering the testimony of the informant. *Government of Virgin Islands v. Hendricks,* 476 F.2d 776 (3d Cir. 1973); *United States v. Bailey, supra,* 451 F.2d at 181.

■ The defendants claim that the Court erred in failing to instruct the jury concerning exemption from the licensing requirement. As previously discussed, the burden is on the defendants to establish that they came within an exception. *McKelvey v. United States,* 260 U.S. 353, 43 S.Ct. 132, 67 L.Ed. 301 (1922); *United States v. Rosenberg,* 515 F.2d 190, 199 (9th Cir. 1975). Since the defendants offered no evidence concerning a statutory exemption, there was no error in failing to so instruct the jury.

*Other Alleged Errors.*

■ The defendants contend that since the Government's proof encompassed conspiratorial meetings and acts in Syracuse, New York and New York City on dates and under circumstances not alleged in the indictment, there was a fatal variance in proof which requires a new trial. It is well established that the Government is not limited in its proof at trial to those overt acts alleged in the indictment. *E. g., United States v. Adamo,* 534 F.2d at 38, *United States v. Quesada,* 512 F.2d 1043, 1046 (5th Cir. 1975). Since the defendants allege only that the Government introduced evidence as to additional overt acts, but do not claim that the Government proved none of the overt acts alleged in the indictment,

to be exported from the United States to Northern Ireland articles on the United States Munitions List without a license, was willfully formed and was existing at or about the time alleged; and

Second, that the particular defendant willfully became a member of the conspiracy; and

Third, that during the pendency of the conspiracy one of the conspirators thereafter committed at least one overt act in furtherance of some object or purpose of the conspiracy; and

Fourth, that such overt act was knowingly done in furtherance of some object or purpose of the conspiracy.

To bring it back to the "No" answer, I want to say the Government has the burden to prove beyond a reasonable doubt both an agreement, that is, the agreement speaking of the conspiracy as being an illegal agreement, and a specific intent to achieve some unlawful purpose, unlawful goal; and it must be shown that a person, the defendant that you are considering, had knowledge of the conspiracy's illicit purpose when he performed acts which furthered that illicit purpose.

I think I have answered it as completely as I could.

**170**

we find no fatal variance in the proof that would prejudice the defendants' substantial rights. 534 F.2d at 38. Furthermore, the Government did prove the majority of the thirty overt acts alleged in the indictment.

■ The defendants allege that the Court erred in failing to declare a mistrial because the prosecutor, in his closing to the jury, mentioned death and violence. We find that the closing address of the prosecutor was neither inflammatory nor prejudicial.

The defendants urge that the Court erred in failing to declare a mistrial because the Government withheld material that they claim should have been produced pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). During the course of the trial, a question arose as to whether a transcript of a phone conversation that Jack Nigro had with defendant Duffy had been prepared by him or by his secretary, Carol Seminaro, and whether Nigro had requested Seminaro to say that she had typed the transcript. After discussion with counsel, the Court ordered the Government to produce any material in its file concerning Seminaro; the Government represented that it had no such material. (N.T. 12–183; 12–195; 15–31; 15–37; 15–54; 15–57; 15–63). Ms. Seminaro was then called as the Court's witness at which time she testified fully as to her conversations with Nigro and with Government agents. (N.T. 15–23—50). Following her testimony, the defendants moved for a mistrial on the ground that the Government had withheld *Brady* material in connection with her testi-

mony. (N.T. 15–60). The Court denied the defendants' motion on the basis of its finding in this record that *Brady* material was not withheld. (N.T. 15–67). Furthermore, the Court permitted the defense to recall Nigro for the purpose of determining if he had asked Seminaro to lie about the preparation of the transcript. (N.T. 15–71—73). The defense, however, did not recall Nigro for further cross-examination. (N.T. 15–74). We find no error in the Court's ruling. The *Brady* rule involves discovery, after trial, of information known to the prosecution but unknown to the defense. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976).

■ In the present case, the defense was aware of all the Government's information during trial. Furthermore, unlike *United States v. Harris*, 498 F.2d 1164 (3d Cir.), *cert. denied* 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 665 (1974), cited by defendants, there was no undisclosed false testimony by any of the Government's witnesses.

■ The defendants allege that the Court erred in admitting into evidence firearm purchase records and telephone toll receipts without adequate authentication and chain of custody testimony. We have reviewed the numerous occasions when such records were admitted into evidence and find no error.[21]

The defense alleges that the Government did not comply with a pretrial consent order in that it repeatedly introduced evidence which had not been disclosed to the defense.

---

**21.** For example, Marie Hallowell, the bookkeeper in charge of records for Montgomery Loan Co., testified that in the ordinary course of business she made all the entries into the federally required firearms forms at the time of their sale. (N.T. 2–67—72). John Rugg, General Manager of Century Arms, Inc., testified that documents reflecting transactions with Palace Firearms were made at the time of the transaction and kept in the regular course of business. (N.T. 2–118—127). Robert Smith, a firearms dealer, testified that the invoices produced at trial were completed contemporaneously with the transaction and kept in the regular course of business. (N.T. 3–11). Marjorie Palace testified that she or her secretary, under

her supervision, prepared lists of serial numbers of firearms on her invoices of firearms transactions. (N.T. 3–127—131; 3–177—182; 3–187; 3–190) and that some of her records were copied by a secretary under her supervision from the original records that had been "dirtied" in a flood. (N.T. 3–192—245; 4–6—24). Noel Haera, an ATF agent, testified that he had obtained telephone toll records by personally contacting the Bell Telephone Company pursuant to an arrangement with the telephone company for the supply of such records. (N.T. 10–103). Edgar Turner, the official custodian of the Bell Telephone Company, delivered telephone toll records pursuant to subpoena. (N.T. 7–199).

In this complex case involving a multitude of documents, we find no bad faith on the part of the Government and no prejudice to the defendants.

*Motion To Inspect Grand Jury Minutes.*

The defendants have moved for permission to inspect the grand jury minutes pursuant to Rule 6(e) of the Federal Rules of Criminal Procedure. This motion was made by the defendants on the last day of this protracted trial and is based on the allegation that the Government willfully misused the grand jury process in that no evidence was presented to the grand jury concerning the violation of 18 U.S.C. § 951. (N.T. 17–104—107). Even though the counts charging violation of this statute were dismissed at the close of the Government's case, the defendants allege that they were prejudiced by the Government's bypass of the grand jury procedure because inflammatory evidence concerning terrorism and insurgency which, they claim, was not relevant to the charges on which they were found guilty, was introduced into evidence to support the Government's case under 18 U.S.C. § 951.

Although the defendants have cited cases discussing prosecutorial or judicial amendment of a valid indictment or variance of proof between the allegations of the indictment and the evidence at trial, the real thrust of their argument is that there was insufficient evidence presented to the grand jury to support a violation of 18 U.S.C. § 951. In *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 408–09, 100 L.Ed. 397 (1956), the Supreme Court said:

If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. . . . An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid

on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more. (Footnote omitted).

See also, *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974); *United States v. Basurto,* 497 F.2d 781 (9th Cir. 1974); *United States v. Kenny,* 462 F.2d 1205 (3d Cir. 1972), cert. denied 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176; *United States v. Rundle,* 383 F.2d 421 (3d Cir. 1967), cert. denied 393 U.S. 863, 89 S.Ct. 144, 21 L.Ed.2d 131 (1968). Disclosure of grand jury minutes is committed to the discretion of the trial judge. *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959); *United States v. Bertucci,* 333 F.2d 292 (3d Cir.), cert. denied 379 U.S. 839, 85 S.Ct. 75, 13 L.Ed.2d 45 (1964). We see no special circumstances which would justify our rejection of this well settled law by permitting the defendants to inspect the grand jury minutes.[22] Such ruling is particularly applicable in this case where defendants' motion was filed on the last day of trial and after the Court had directed a verdict of acquittal as to the counts alleging a violation of 18 U.S.C. § 951.

Even if we accept defendants' argument, however, they were not prejudiced by any testimony produced by the Government to support the charges pursuant to 18 U.S.C. § 951. Furthermore, Rule 12(b)(2) of the Federal Rules of Criminal Procedure requires defenses and objections based on defects in the indictment, other than that it fails to show jurisdiction in the Court or to charge an offense, to be raised prior to trial. Defendants' motion, made on the last day of trial, was therefore untimely filed. *West v. United States,* 359 F.2d 50 (8th Cir.), cert. den. 385 U.S. 867, 87 S.Ct. 131, 17 L.Ed.2d 94 (1966). *See Sewell v. United States,* 406 F.2d 1289 (8th Cir. 1969); *United States v. Visconti,* 261 F.2d 215 (2d Cir.),

22. Furthermore, we see no evidence of bad faith on the part of the Government, as alleged by the defendants, in seeking to return an indictment of the counts charging violation of 18 U.S.C. § 951. From the beginning of the trial, the Government expressed confidence that it could prove the counts charging violation of 18 U.S.C. § 951; the Government argued strenuously against defendants' motion for acquittal on those counts.

*cert. denied* 359 U.S. 954, 79 S.Ct. 743, 3 L.Ed.2d 762 (1959); *United States v. Miller,* 246 F.2d 486 (2d Cir.), *cert. denied* 355 U.S. 905, 78 S.Ct. 332, 2 L.Ed.2d 261 (1957).

Accordingly, as set forth in the attached Order, the Court, for the above mentioned reasons:

1. Denies the defendants' motion for arrest of judgment;

2. Grants the defendants' motion for judgment of acquittal on Counts 4, 5, 9, 11, 13, 15 and 16;

3. Denies the defendants' motion for judgment of acquittal on Count 1;

4. Denies the defendants' motion for a new trial; and

5. Denies the defendants' motion to inspect the grand jury minutes.